FULBRIGHT & JAWORSKI L.L.P.
666 FIFTH AVENUE
NEW YORK, NEW YORK 10103
TEL.: (212) 318-3000
FAX.: (212) 318-3400

ATTORNEYS FOR PLAINTIFF

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 0 7 2011 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------- X

THE GEO GROUP, INC.,

       Plaintiff,

   -against-

COMMUNITY FIRST SERVICES, INC.,

JACK A. BROWN, III,

AYKROYD LAKE, and

JOSETTE NELSON-DABO,

       Defendants.

---------------------------------------------------- X

CV11 - 1711

CIVIL ACTION NO. _____

**COMPLAINT**

**PLAINTIFF DEMANDS JURY TRIAL**

**SUMMONS ISSUED**

AMON. J.

POLLAK. M.J

The GEO Group, Inc. ("GEO Group"), appearing through its undersigned counsel, Fulbright & Jaworski L.L.P., alleges as follows:

## NATURE OF THE ACTION

1.    This case involves unlawful actions by defendants Jack A. Brown III ("Brown") and Community First Services, Inc. ("CFS") ("Defendants"), as well as Josette Nelson-Dabo ("Dabo") and Aykroyd Lake ("Lake") ("Conspiracy Defendants"). Specifically, the Defendants stole confidential and proprietary information of plaintiff The GEO Group, Inc. ("GEO Group")

and, working with the Conspiracy Defendants, used it to obtain a government contract issued on February 16, 2011 by the United States Department of Justice/Bureau of Prisons ("BOP"). The base value for this contract exceeds $11.5 million. It is referred to herein as the "BOP Contract." But for the unlawful actions of Defendants and the Conspiracy Defendants, the BOP Contract would have been awarded to GEO Group.

      2.     The theft of GEO Group's information took place, in part, while certain of the defendants were employed by GEO Group. The ringleader of the scheme was Brown. He was employed by GEO Group as Vice President, Community Corrections during the period from on or about October 31, 2005 until March 13, 2009. During this entire time, unbeknownst to GEO Group, Brown was running another business on the side -- CFS. Brown, despite the fact that he owed a duty of loyalty to GEO Group, abused his position of trust to gain access to GEO Group's commercially sensitive information and misappropriated this information for the benefit of CFS and himself. Specifically, Brown used GEO Group's information to prepare a competing bid for the BOP Contract that he submitted on behalf of CFS. Less than a week before proposals were due for the BOP Contract, Brown resigned from GEO Group without explanation. Brown then submitted the CFS competing bid on or about March 18, 2009, a fact that GEO Group did not learn until recently.

      3.     On February 16, 2011, the BOP announced that it had awarded the BOP Contract to CFS. BOP subsequently informed GEO Group that there were only two bidders for the BOP Contract – GEO Group and CFS – and that CFS won the award because its bid was lower than that of GEO Group. Brown's preparation and submission of a bid from CFS while he had full knowledge of GEO Group's contract pricing information violated applicable federal procurement law. Had Brown not misappropriated GEO Group's confidential and proprietary information,

the BOP Contract would have been awarded to GEO Group.

4.     On information and belief, Brown was substantially assisted in his efforts by the Conspiracy Defendants, who also secretly and unlawfully held positions at CFS while employed by GEO Group.  The Defendants and the Conspiracy Defendants engaged in a common scheme to undermine GEO Group and obtain the BOP Contract for CFS.

## JURISDICTION

5.     The matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.  The Court therefore has original jurisdiction over GEO Group's claims pursuant to 28 U.S.C. § 1332(a).

## VENUE

6.     Venue in this district is proper under 28 U.S.C. § 1391(a).  On information and belief, defendants CFS, Brown and Lake reside in this district, and a substantial part of the events or omissions giving rise to GEO Group's claims occurred in this district.

## PARTIES

7.     GEO Group is a publicly traded Florida corporation with its principal place of business at One Park Place, 621 NW 53rd Street, Suite 700, Boca Raton, Florida 33497.  Formed in 1984, GEO Group is an industry leader in the delivery of private correctional and detention management services, community residential re-entry services, and behavioral and mental health services to federal, state and local government agencies.

8.     On information and belief, defendant CFS is a New York corporation with its principal place of business at 45 Main Street, Suite 711, Brooklyn, New York 11201.  CFS purports to operate community-based re-entry services facilities and provide treatment and rehabilitation programs under contracts with federal, state and local government agencies.

9.     On information and belief, defendant Brown is the founder, President and CEO of

- 3 -

CFS and resides at 13 Lexington Avenue, Apt. 7, Brooklyn, New York 11238. Until his abrupt resignation from GEO Group on March 13, 2009, Brown served as Vice President, Community Corrections for GEO Group.

10.     On information and belief, defendant Lake is an individual residing at 1202 East 82nd Street, Apt. 2, Brooklyn, New York 11236. Lake was the Facility Manager for GEO Group's Brooklyn Facility from on or about October 31, 2005 to March 15, 2010, when he was terminated. On information and belief, Lake also held a position at CFS during some or all of the time he was employed by GEO Group.

11.     On information and belief, defendant Dabo is an individual residing at 65 West 96th Street, Apt. 4D, New York, New York 10025. Dabo was employed by Correctional Services Corporation ("CSC"), and then by GEO Group following its acquisition of CSC, as Assistant Facility Administrator for the BOP Residential Re-entry center ("RRC") in Brooklyn, New York ("Brooklyn Facility") during the period from January 8, 1996 to March 21, 2008. Dabo resigned from GEO Group on March 21, 2008, for "other employment." On information and belief, Dabo also held a position at CFS during some or all of the time she was employed by GEO Group. Specifically, on information and belief, Dabo began serving as Vice President of CFS in 2005, and continued to serve in this role until at least August 12, 2009.

12.     On information and belief, at all times relevant to the allegations in this complaint, Brown, Lake and Dabo committed their unlawful and tortious acts on behalf of, and for the benefit of, CFS, and within the scope of their employment by CFS.

13.     On information and belief, at all times relevant to the allegations in this complaint, Brown dominated CFS and such domination was used to commit wrongs against GEO Group.

## FACTUAL ALLEGATIONS

*GEO Group and the Brooklyn Facility*

14.     GEO Group's goal is to help its clients serve those assigned to its care through a wide range of diversified services including the design, construction and financing of state and federal prisons, immigration and detention centers, community re-entry facilities, mental health and residential treatment centers and other special needs institutions. GEO Group's operations include the management and/or ownership of approximately 118 correctional, detention and residential treatment facilities encompassing approximately 81,000 beds.

15.     As part of its community re-entry services, GEO Group has been successfully operating the Brooklyn Facility for the BOP since November 2005, when it acquired CSC, the original contractor. CSC began operating the Brooklyn Facility in June 1989 following a competitive procurement. The Brooklyn Facility is accredited by the American Correctional Association.

16.     GEO Group operates a similar RRC facility in the Bronx (the "Bronx Facility").

17.     The Brooklyn Facility houses pre-release and community corrections residents. The pre-release component of the Brooklyn Facility provides residents with the skills and resources necessary to make the transition from an institutional setting to independent and responsible living in the community. The community corrections component provides the same skill and resource training, although residents are confined to the facility when they are not engaged in employment and community services projects or court-directed activities.

18.     The Brooklyn Facility plays a vital role in the rehabilitation process of federal offenders. The staff works closely with the community to provide offenders with a comprehensive program that puts them in touch with available resources while they give back to the community.

19.   GEO Group's current contract with the BOP for operation of the Brooklyn Facility runs, with extension, through July 31, 2011.

**_Defendants CFS and Brown_**

20.   Brown was employed by CSC from approximately 1992 until in or about November 2005, when CSC was acquired by GEO Group.  At that time, Brown became a GEO Group officer and employee -- Vice President, Community Corrections for GEO Group.

21.   On information and belief, Brown was unhappy that GEO Group acquired CSC, and he actively worked to undermine GEO Group's operation of the Brooklyn Facility.  Brown's actions included, but were not limited to, communications with GEO Group employees and communications with politicians.

22.   Before GEO Group's acquisition of CSC was finalized, Brown began taking steps to create his own business which would one day compete with GEO Group.  On information and belief, on or about March 16, 2005, Brown incorporated CFS as a Domestic Not-for-Profit Corporation with the New York Department of Corporations.  According to the current CFS website, Brown is the Founder, President and CEO of CFS.  CFS also reports on its website that it is currently funded by, or developing projects with, various federal, state and local government agencies.

23.   Brown never informed GEO Group management of the existence of CFS or his role in the company.  GEO Group did not learn of the existence of CFS until February 16, 2011, when the BOP announced that the BOP Contract had been awarded to CFS.

24.   On information and belief, Brown performed work for the benefit of CFS on GEO Group time.

25.   On information and belief, Brown also operated two other entities, Justice

Services Corporation and Community Justice Services LLC, while he was employed by GEO
Group. Brown did not disclose the existence of either of these entities to GEO Group.

### GEO Group's Code of Ethics of Business Conduct and Ethics

26.     On July 30, 2007, Brown executed a certificate acknowledging his receipt and
understanding of GEO Group's Code of Ethics of Business Conduct and Ethics (the "Code of
Ethics").

27.     On October 4, 2006, Lake executed a certificate acknowledging his receipt and
understanding of the Code of Ethics. He also signed such a certificate on July 2, 2007, and July
9, 2008.

28.     On July 30, 2007, Dabo executed a certificate acknowledging her receipt and
understanding of the Code of Ethics.

29.     Section 2 of the Code of Ethics addresses Conflicts of Interest. It states, in
pertinent part:

> It is almost always a conflict of interest for a Company employee to work
> simultaneously for a competitor, customer or supplier. You are not allowed to
> work for a competitor as a consultant or a board member. The best policy is to
> avoid any direct or indirect business connection with our customers, suppliers or
> competitors, except on our behalf. Conflicts of interest are prohibited as a matter
> of Company policy, except under guidelines approved by the Board of Directors.

30.     Section 3 of the Code of Ethics addresses Corporate Opportunities. It states:

> Employees, officers and directors are prohibited from taking for themselves
> personally opportunities that are discovered through the use of corporate
> property, information or position without the consent of the Board of Directors.
> No employee may use corporate property, information or position for improper
> personal gain, and no employee may compete with the company directly or
> indirectly. Employees, officers and directors owe a duty to the Company to
> advance its legitimate interests when the opportunity to do so arises.

31.     Section 9 of the Code of Ethics addresses Confidentiality. It states:

> Employees must maintain the confidentiality of confidential information entrusted
> to them by the Company or its customers, except when disclosure is authorized by

- 7 -

*the Legal Department or required by laws or regulations. Confidential information includes all non-public information that might be of use to competitors, or harmful to the Company or its customers, if disclosed. It also includes information that suppliers and customers have entrusted to us. The obligation to preserve confidential information continues even after employment ends.*

### The Brooklyn RRC Rebid

32.     On November 7, 2008, the BOP issued a Sources Sought Notice, Solicitation Number RFI-200-1042-NE, for residential re-entry services in Brooklyn, New York. As the incumbent contractor, GEO Group competed for this new contract so that it could continue the important services it was providing at the Brooklyn Facility.

33.     GEO Group sought the assistance of Brown and Lake in preparing its response to the Sources Sought Notice. On November 12, 2008, GEO Group provided Brown and Lake a draft response to the Sources Sought Notice. Brown and Lake reviewed and commented on GEO Group's response to the Sources Sought Notice.

34.     GEO Group submitted its response to the Sources Sought Notice to the BOP on November 14, 2008. Brown and Lake received a copy of GEO Group's final submission on or about January 17, 2009.

35.     On December 10, 2008, the BOP issued a Pre-Solicitation Notice, Solicitation Number RFP 200-1042-NE, for residential services in Brooklyn, New York.

36.     On January 15, 2009, the BOP issued a change to the Pre-Solicitation Notice, expanding the geographical range of the pre-solicitation to seek residential re-entry services in either Brooklyn or Queens, New York.

37.     Due to this geographic expansion, GEO Group management suspected that another entity could be competing for the contract. On January 15, 2009, Ron Maddux ("Maddux"), Vice President-Project Development for GEO Group, emailed the project team for

GEO Group's rebid on the residential re-entry services contract ("Brooklyn RRC Project Team"), including Brown and Lake, and specifically asked Brown for the identity of GEO Group's potential competitor. Brown did not respond to this communication, or ever inform GEO Group that his own company, CFS, was the competitor for the BOP Contract.

38.     John Hurley ("Hurley"), Senior Vice President, Operations, and President, U.S. Corrections for GEO Group, sent follow-up email communications to Brown on January 20 and January 21, 2009, regarding potential competitors for the RRC rebid. Brown also never disclosed to Hurley that his own company, CFS, was the competitor for the BOP Contract.

39.     On or about January 16, 2009, the BOP issued request for proposal ("RFP") 200-1042-NE, soliciting proposals for the provision of residential re-entry services in Brooklyn, New York or Queens, New York, beginning February 1, 2010. GEO Group commonly referred to this solicitation and its proposal in response to the solicitation as the "Brooklyn RRC rebid" or the "Brooklyn rebid."

40.     All materials developed by GEO Group in response to a government contract proposal are highly confidential and proprietary. Even within GEO Group, such information is shared only with select individuals.

41.     On January 20, 2009, at 4:15 p.m., Maddux sent an email to Brown requesting his assistance with various items for the Brooklyn rebid (the "1/20 4:15 email"). Mr. Maddux provided Brown with copies of various documents to assist in this effort, including:

(a)     CSC's Brooklyn Facility Staffing Plan from its last RRC rebid;

(b)     GEO Group's Bronx Facility Staffing Plan from its last RRC rebid;

(c)     GEO Group's Bronx Facility Weekly Schedule;

(d)     GEO Group's Bronx Facility Personnel Resources Plan;

(e)     GEO Group's Bronx Facility community support letters;

(f)     GEO Group's Bronx Facility Community Relations Plan;

(g)     a Community Resources Directory that CSC used in its prior Brooklyn Facility rebid; and

(h)     a Local Area Concerns document that was used in CSC's last Brooklyn Facility rebid.

42.     Three of the documents provided to Brown in the 1/20 4:15 email, specifically, the CSC Brooklyn Facility Staffing Plan, the GEO Group Bronx Facility Staffing Plan, and the GEO Group Bronx Facility Weekly Schedule, are Excel spreadsheet documents whose format and formulas were easily adaptable for use to prepare a competing bid for the BOP Contract. Upon information and belief, Brown and/or the Conspiracy Defendants used this information to prepare the competing bid from CFS.

43.     On February 10, 2009, Brown, along with other members of the Brooklyn RRC Project Team, received a copy of GEO Group's proposal outline, which set out the primary requirements and deadlines for GEO Group's response to RFP 200-1042-NE. This outline is proprietary GEO Group work product.

44.     Brown and Lake, at all times relevant to this Complaint, had knowledge of GEO Group's pricing proposal information. This information was a critical part of GEO Group's response to RFP 200-1042-NE. Upon information and belief, Brown and/or the Conspiracy Defendants used GEO Group's pricing proposal information to prepare the competing bid from CFS and to obtain the BOP Contract.

45.     The pricing proposal for RFP 200-1042-NE was initially prepared at the corporate level for GEO Group. The pricing proposal was then emailed for review and revision to Angela

Meister ("Meister"), the GEO Group Multi-Unit Business Manager for the Brooklyn Facility. The pricing proposal was contained in a series of four spreadsheets with detailed information regarding, among other things, the prior and projected costs and expenses of the Brooklyn Facility.  Such costs and expenses included the following categories:

    (a)      personnel expenses (e.g., wages, taxes, benefits);

    (b)      operating expenses (e.g., medical, food service, security);

    (c)       maintenance expenses;

    (d)      program costs;

    (e)      utility expenses;

    (f)      administration costs;

    (g)      lease expenses; and

    (h)      insurance costs.

46.     In the pricing proposal spreadsheet, for each category and sub-category of cost or expense, the amounts of GEO Group's actual 2007 and 2008 expenses were included, as well as GEO Group's projected costs/expenses for each year of the proposed ten-year course of the BOP Contract.

47.     The pricing information in the pricing proposal is used to determine a per diem rate charged per day for each inmate that is a resident in an RRC facility.  The per diem rate includes all direct and indirect costs as well as GEO Group's profits.  This per diem rate is the crucial pricing component in a bid for any BOP contract, including the BOP Contract at issue. Upon information and belief, Brown and/or the Conspiracy Defendants used their knowledge of GEO Group's proposed per diem rate to prepare the competing bid from CFS.

48.     Throughout the proposal preparation process for RFP 200-1042-NE, from January

to March 2009, Meister communicated with Brown on an ongoing basis regarding the pricing proposal. This included Meister sharing information and data with Brown from the pricing proposal spreadsheets and seeking his input regarding the applicable costs and expenses.

49.     During the first week of March 2009, Meister met with Brown and Lake to review the draft proposal pricing information on a line-by-line basis. Meister used a print-out of the pricing spreadsheet in this meeting and showed the spreadsheet information to Brown and Lake. Meister also presented Brown and Lake with the per diem rates that GEO Group planned to use in its bid for the BOP Contract. At the meeting, Brown stated that he believed GEO Group's per diem rates would be undercut by GEO Group's competitors. Ms. Meister asked Brown which competitors he was referring to, but he refused to answer. Brown did not disclose that his own company, CFS, was the competitor. No changes were made to the per diem rates during the meeting.

50.     During the GEO Group proposal preparation process, Brown forwarded certain internal GEO Group emails regarding RFP 200-1042-NE to his personal email account (jackbrown3@yahoo.com) and to his wife, Michele Barton (barton_ml@yahoo.com). There was no legitimate business purpose for Brown to do this.

51.     The documents listed in paragraph 41(a)-(d) and (f)-(h) above, as well as GEO Group's pricing proposal information, are confidential and proprietary trade secret proposal preparation materials and information of GEO Group. These proposal preparation materials contain information that GEO Group withholds from public disclosure due to the competitive harm such disclosure would cause GEO Group. For example, if a competitor knows GEO Group's staffing plans, it can make strategic reductions in certain areas to undercut GEO Group in the competitive bidding process, because GEO Group's pricing structures are derived in large

measure from the staffing plans for its facilities.  GEO Group also restricts dissemination of its proposal preparation materials and information among its own employees, limiting disclosure to key personnel.  These proposal preparation materials and information are not readily acquired or duplicated by others.  Upon information and belief, Brown and/or the Conspiracy Defendants used GEO Group's proposal preparation materials and information to prepare the competing bid from CFS.

52.     On March 13, 2009, George Zoley ("Zoley"), Chairman and CEO for GEO Group, spoke with Brown regarding GEO Group's preparation of the response to the RFP.  In one conversation, Brown requested that Zoley make him a partner in the Brooklyn Facility.  Zoley denied this request.  During another conversation that same day, Zoley specifically asked Brown whether there were any other bidders competing for the RFP 200-1042-NE contract.  Brown answered "no."  This statement was knowingly false when made, as Brown knew at the time that CFS was preparing a competing bid.

*Brown's Resignation from GEO Group*

53.     On March 13, 2009, less than one week before proposals for the BOP Contract were due, Brown suddenly and without warning resigned from GEO Group.

54.     Following Brown's resignation, Zoley travelled to the Brooklyn Facility and asked Lake whether he had any knowledge as to why Brown resigned and what Brown was doing at present.  Lake answered that he had no such information.  Zoley also asked Lake if he was aware of any competing responses to RFP 200-1042-NE.  Lake answered "no."  On information and belief, these statements were knowingly false when made, as Lake was involved with CFS at that time, knew that Brown had formed the competing entity, and knew that CFS was submitting a competing bid in response to RFP 200-1042-NE.

55.     Responses to RFP 200-1042-NE were due March 18, 2009.  Defendants and the Conspiracy Defendants were working on CFS's response to the RFP during the time that Brown and Lake were employed by GEO Group.  Defendants and the Conspiracy Defendants used GEO Group's confidential, proprietary and trade secret information to prepare CFS's competing bid and obtain the BOP Contract.

***Award to CFS; GEO Group's Bid Protest***

56.     On February 16, 2011, BOP announced that it had awarded the BOP Contract to CFS at the estimated cost of $11,533,718.00 for the two-year Base Period.  In its notice of award, the BOP stated:  "It was determined that the proposal submitted by Community First Services, Inc. was the best value to the Government."

57.     On February 25, 2011, representatives of GEO Group participated in a debriefing with BOP regarding RFP 200-1042-NE.  At the debriefing, BOP representatives stated that CFS and GEO Group were the only bidders for the BOP Contract and that CFS had substantially underbid GEO Group, offering a total price of $29,633,338 compared to the $34,161,141 offered by GEO Group.

58.     BOP representatives further stated that GEO Group and CFS received the highest possible rating for the technical requirements of the contract.  BOP representatives told GEO Group that, because both companies were rated equally on all non-price evaluation factors, BOP's decision came down to price.

59.     On February 28, 2011, GEO Group filed an agency protest of the award to CFS in response to RFP 200-1042-NE with the BOP.  As of the date this Complaint was filed, GEO Group's bid protest is pending.

## COUNT I

## UNFAIR COMPETITION (AGAINST CFS AND BROWN)

60.    GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

61.    Brown was a member of the Brooklyn RRC Project Team, and was given access to GEO Group's proposal preparation materials and information (including materials prepared by GEO Group's predecessor, CSC, which are now owned solely by GEO Group), including but not limited to:

(a)    GEO Group's draft and final response to the BOP's Sources Sought Notice for solicitation RFI 200-1042-NE;

(b)    GEO Group's proposal outline for RFP 200-1042-NE;

(c)    CSC's Brooklyn Facility Staffing Plan from its last RRC rebid;

(d)    GEO Group's Bronx Facility Staffing Plan from its last RRC rebid;

(e)    GEO Group's Bronx Facility Weekly Schedule from its last RRC rebid;

(f)    GEO Group's Bronx Facility Personnel Resources Plan from its last RRC rebid;

(g)    GEO Group's Bronx Facility community support letters from its last RRC rebid;

(h)    GEO Group's Bronx Facility Community Relations Plan from its last RRC rebid;

(i)    CSC's Community Resources Directors from its last Brooklyn Facility RRC rebid;

(j)    CSC's Local Area Concerns document from its last Brooklyn Facility RRC rebid;

(k)    GEO Group's pricing proposal information for its response to RFP 200-1042-NE; and

(l)    GEO Group's per diem rates for its response to RFP 200-1042-NE.

62.     Lake also was given access to GEO Group's proposal preparation materials and information, including GEO Group's draft response to the BOP's Sources Sought Notice for solicitation RFI 200-1042-NE, GEO Group's pricing proposal information for its response to RFP 200-1042-NE, and GEO Group's per diem rates for its response to RFP 200-1042-NE.

63.     GEO Group's proposal preparation materials and information were the product of GEO Group's own labor, skill, and expenditures.

64.     Defendants misappropriated GEO Group's proposal preparation materials and information to prepare a competing bid on behalf of CFS.  On information and belief, the CFS proposal plagiarized GEO Group's proposal.

65.     Defendants' acts of unfair competition were intentional, willful, malicious, and in callous disregard of GEO Group's rights to its work product.

66.     Defendants' acts of unfair competition have caused and will continue to cause GEO Group to suffer irreparable harm for which there is no adequate remedy at law.

67.     In addition, GEO Group has suffered damages based on Defendants' acts of unfair competition in an amount to be determined at trial.

## COUNT TWO

## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION (AGAINST CFS AND BROWN)

68.     GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

69.     Brown and Lake were given access to GEO Group's confidential proposal preparation materials and information.  Defendants used GEO Group's confidential proposal preparation materials and information to prepare a competing proposal on behalf of CFS.

70.     Defendants obtained a competitive advantage through their use of GEO Group's

confidential proposal preparation materials and information.  On information and belief, they plagiarized GEO Group's own proposal, and used their knowledge of GEO Group's confidential pricing data and other information to underbid GEO Group in response to RFP 200-1042-NE and improve CFS's otherwise limited technical and experience qualifications.

71.    CFS was awarded the BOP Contract in response to RFP 200-1042-NE because of the illegal use of GEO Group's confidential pricing data and other information by Defendants.

72.    Defendants' acts in misappropriating GEO Group's confidential proposal preparation materials and information were intentional, willful, malicious, and in callous disregard of GEO Group's rights.

73.    Defendants' misappropriation of GEO Group's confidential proposal preparation materials and information has caused and may continue to cause GEO Group to suffer irreparable harm for which there is no adequate remedy at law.

74.    In addition, GEO Group has suffered actual damages based on Defendants' misappropriation of its confidential proposal materials and information in an amount to be determined at trial.

### COUNT THREE

### MISAPPROPRIATION OF TRADE SECRETS (AGAINST CFS AND BROWN)

75.    GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

76.    GEO Group's proposal preparation materials and information (with the exception of the community support letters referenced in ¶ 41(e) above), including its pricing proposal information, are trade secrets.  These proposal preparation materials and information are used in GEO Group's business, and give GEO Group an advantage over competitors who do not know or use these materials and information.  If competitors have access to these proposal preparation

materials and information, they can unfairly compete with GEO Group.

77.     Brown obtained access to GEO Group's proposal preparation materials and information through improper means.  At the time GEO Group disclosed its proposal preparation materials and information to Brown, he did not inform GEO Group that he also owned and was operating CFS, and was preparing a competing bid from CFS in response to RFP 200-1042-NE.

78.     Defendants used GEO Group's proposal preparation materials and information to prepare CFS's proposal in response to RFP 200-1042-NE and to obtain the BOP Contract.

79.     Defendants' use of GEO Group's proposal preparation materials and information gave CFS a competitive advantage because CFS used this information to prepare CFS's competing bid and obtain the BOP Contract in response to RFP 200-1042-NE.

80.     Brown used GEO Group's trade secret information for the benefit of CFS in violation of his fiduciary duties to GEO Group, in breach of his agreement pursuant to the GEO Group Code of Ethics, and in derogation of his common law duties of contract, including his duty of good faith and fair dealing to his employer, GEO Group.

81.     Defendants' acts in misappropriating GEO Group's trade secrets were intentional, willful, malicious, and with wanton disregard of GEO Group's interests in its trade secrets.

82.     Defendants' acts in misappropriating GEO Group's trade secrets have caused and will continue to cause GEO Group to suffer irreparable harm for which there is no adequate remedy at law.

83.     In addition, GEO Group has suffered damage based on CFS's and Brown's misappropriation of its trade secrets in an amount to be determined at trial.

## COUNT FOUR

### BREACH OF FIDUCIARY DUTY (AGAINST BROWN, LAKE AND DABO)

84.     GEO Group realleges each allegation in each of the paragraphs above as if fully

set forth herein.

85.     As officers and/or employees of GEO Group, Brown, Lake and Dabo owed GEO Group a fiduciary duty, and were bound to exercise the utmost good faith and loyalty in the performance of their duties.

86.     Brown breached his fiduciary duty to GEO Group by: (a) owning and operating CFS, a competing business, while employed by GEO Group; (b) failing to truthfully disclose to GEO Group that he owned and operated CFS; (c) failing to truthfully disclose to GEO Group that he was submitting a competing proposal through CFS in response to RFP 200-1042-NE; (d) failing to abide by the GEO Group Code of Ethics; (e) using GEO Group company time to run CFS; and (f) using GEO Group's confidential, proprietary and trade secret proposal preparation materials and information to prepare a competing bid in response to RFP 200-1042-NE on behalf of CFS.

87.     Lake breached his fiduciary duty to GEO Group by:  (a) working for CFS, a competing business, while employed by GEO Group; (b) failing to truthfully disclose to GEO Group that he was working for CFS; (c) failing to truthfully disclose to GEO Group that Brown and CFS were submitting a competing proposal in response to RFP 200-1042-NE; and (d) failing to abide by the GEO Group Code of Ethics.

88.     Dabo breached her fiduciary duty to GEO Group by:  (a) working for CFS, a competing business, while employed by GEO Group; (b) failing to truthfully disclose to GEO Group that she was working for CFS; and (c) failing to abide by the GEO Group Code of Ethics.

89.     Brown's, Lake's, and Dabo's breaches of their fiduciary duties were intentional, willful, and malicious.

90.     GEO Group has been damaged as a result of Brown's, Lake's and Dabo's breach

of their fiduciary duties in an amount to be determined at trial.

## COUNT FIVE

## FRAUD (AGAINST CFS AND BROWN)

91.     GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

92.     Defendants perpetrated a fraud on GEO Group designed to promote CFS's commercial interests by allowing Brown access to confidential, proprietary, and trade secret information of GEO Group to prepare a competing bid in response to RFP 200-1042-NE on behalf of CFS.

93.     Brown purposefully and repeatedly failed to truthfully disclose to GEO Group that he was running a competing business, CFS, while also employed by GEO Group and while he was accessing GEO Group's confidential and proprietary proposal preparation materials and information and trade secrets.

94.     Brown also repeatedly and purposefully failed to truthfully disclose to GEO Group that his company, CFS, was preparing and submitting a competing bid in response to RFP 200-1042-NE.  Specifically, Brown purposefully failed to respond to the inquiries by Maddux, Hurley, and Meister set forth above.  When Brown was asked point-blank by Zoley whether there were any other companies bidding on RFP 200-1042-NE, he responded "no," although he knew his statement to be false because CFS was preparing a competing bid.

95.     Brown knew the above-referenced misrepresentations and omissions of material fact were false when made.

96.     Brown made these knowingly false representations and omissions of material facts in order to continue to gain access to GEO Group's confidential, proprietary, and trade secret proposal preparation materials and information.

- 20 -

97.   GEO Group relied on Brown's knowing misrepresentations and omissions by continuing to give him access to GEO Group's confidential, proprietary, and trade secret proposal preparation information, as well as by continuing to employ him.  If GEO Group had known that Brown was running CFS, and knew that CFS was preparing a competing bid in response to RFP 200-1042-NE, GEO Group, at minimum, would have terminated Brown's employment, and would not have allowed Brown to continue to access GEO Group's proposal preparation materials and information.

98.   As a result of Defendants' fraud, GEO Group was not awarded the BOP contract. Defendants clearly and blatantly intended to defraud GEO Group.  Their acts were intentional, willful and malicious.  GEO Group has suffered damage as a result of Defendants' fraud in an amount to be determined at trial.

## COUNT SIX

## NEGLIGENT MISREPRESENTATION (AGAINST CFS AND BROWN)

99.   GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

100.   As a GEO Group employee, Brown owed GEO Group fiduciary duties, and had a duty to give correct information to GEO Group.

101.   Brown violated these duties by making false representations and omissions of material facts to GEO Group, including failing to inform GEO Group that he was running a competing business, CFS, while also employed by GEO Group and while being given access to GEO Group's confidential and proprietary information and trade secrets.

102.   Brown also violated these duties by failing to inform GEO Group that his company, CFS, was preparing and submitting a competing bid in response to RFP 200-1042-NE. Specifically, Brown purposefully failed to respond to the inquiries by Maddux, Hurley, and

- 21 -

Meister set forth above.  When Brown was asked point-blank by Zoley whether there were any other companies bidding on RFP 200-1042-NE, he responded "no," although he knew his statement to be false because CFS was preparing a competing bid.

103.   Brown knew or reasonably should have known that the above-referenced misrepresentations and omissions of material fact were false when made.

104.   Brown knew that the information he supplied (or failed to provide) to GEO Group about competitor companies bidding on RFP 200-1042-NE was desired by GEO Group for a serious purpose, namely, for use in preparing its own response to RFP 200-1042-NE.

105.   GEO Group relied on Brown's misrepresentations and omissions by continuing to give him access to GEO Group's confidential, proprietary, and trade secret proposal preparation information, as well as by continuing to employ him.  If GEO Group had known that Brown was running CFS, and knew that CFS was preparing a competing bid in response to RFP 200-1042-NE, GEO Group would have terminated Brown's employment, and would not have allowed Brown to continue to access GEO Group's proposal preparation materials and information.

106.   As a result of Defendants' negligent misrepresentations and omissions of material fact, GEO Group lost the BOP contract.

107.   Defendants' misrepresentations were made willfully and maliciously.

108.   GEO Group has been damaged as a result of Defendants' negligent misrepresentations in an amount to be proven at trial.

### COUNT SEVEN

### DIVERSION OF CORPORATE OPPORTUNITIES (AGAINST BROWN)

109.   GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

110.   GEO Group was the incumbent contractor bidding in response to RFP 200-1042-

NE. If GEO Group were awarded the BOP Contract in response to RFP 200-1042-NE, it would have continued to operate the Brooklyn Facility, which GEO Group and its predecessor CSC had been running since 1989.

111.    Brown knew as early as November 12, 2008, when he received GEO Group's draft response to BOP's Source Selection Notice, that GEO Group would be bidding on RFP 200-1042-NE.

112.    GEO Group provided Brown with confidential, proprietary, and trade secret proposal preparation materials and information that it used to prepare its response to RFP 200-1042-NE.

113.    Brown used the proposal preparation materials and information he learned as an employee and officer of GEO Group to prepare a competing proposal in response to RFP 200-1042-NE on behalf of his own rival company, CFS, and to obtain the BOP Contract.

114.    As an employee and officer of GEO Group, the GEO Group Code of Ethics prohibited Brown from diverting corporate opportunities for his own benefit.

115.    As a result of CFS's competing submission, GEO Group lost the contract to run the Brooklyn Facility.

116.    Brown's acts in diverting GEO Group's corporate opportunity to his own company, CFS, were willful, wanton and malicious.

117.    GEO Group has been damaged as a result of Brown's diversion of its corporate opportunity in an amount to be determined at trial.

## COUNT EIGHT

## INTERFERENCE WITH PROSPECTIVE CONTRACT (AGAINST CFS AND BROWN)

118.    GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

119.    GEO Group was the incumbent contractor for the Brooklyn RRC contract and had an existing contractual and business relationship with the BOP.

120.    GEO Group sought to continue its contractual and business relationship with the BOP by submitting a proposal in response to RFP 200-1042-NE to continue operating the Brooklyn Facility.

121.    Brown was tasked with assisting GEO Group with its response to RFP 200-1042-NE, and in so doing he was provided with GEO Group's confidential, proprietary, and trade secret proposal preparation materials and information.

122.    Unbeknownst to GEO Group, Brown was running his own competing business on the side, CFS. Brown used the proposal preparation materials and information he obtained from GEO Group to prepare a competing proposal on behalf of CFS in response to RFP 200-1042-NE to obtain the BOP Contract.

123.    Brown breached his fiduciary duty to GEO Group by obtaining and using GEO Group's confidential, proprietary, and trade secret proposal preparation materials and information to prepare CFS's competing proposal. Brown obtained GEO Group's confidential, proprietary, and trade secret information through dishonest, unfair, and improper means, including fraudulent representations and omissions and in breach of his fiduciary duty.

124.    By submitting a competing proposal on behalf of CFS, and obtaining the BOP Contract, Defendants interfered with GEO Group's prospective contract with the BOP.

125.    Defendants' acts were willful, wanton and malicious.

126.    GEO Group has been damaged as a result of Defendants' interference with its prospective contract in an amount to be determined at trial.

## COUNT NINE

## BREACH OF CONTRACT (AGAINST BROWN, LAKE AND DABO)

127.   GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

128.   On July 30, 2007, Brown acknowledged in writing that he had received, read, and understood "The GEO Group, Inc. Code of Ethics of Business Conduct and Ethics."

129.   On October 4, 2006, July 2, 2007, and July 9, 2008, Lake acknowledged in writing that he had received, read, and understood the Code of Ethics.

130.   On July 30, 2007, Dabo acknowledged in writing that she had received, read, and understood the Code of Ethics.

131.   Brown, Lake and Dabo continued to be employed by GEO Group for substantial periods of time after agreeing to the Code of Ethics.

132.   Brown's acts in forming CFS and serving as the CEO of CFS while also employed by GEO Group, and Lake's and Dabo's acts in working for CFS while also employed by GEO Group, are breaches of the Conflicts of Interest provision of the Code of Ethics.  This provision prohibits, among other things, "work[ing] for a competitor as a consultant or board member."

133.   Brown's and Lake's acts in misappropriating and using GEO Group's confidential and proprietary information and trade secrets to prepare a competing bid on behalf of CFS in response to RFP 200-1042-NE while still serving as employees of GEO Group are breaches of the Corporate Opportunities provision of the Code of Ethics.  This provision prohibits "[e]mployees, officers and directors . . . from taking for themselves personally opportunities that are discovered through the use of corporate property, information or position without the consent of the Board of Directors."  It prohibits employees from using "corporate property, information,

or position for improper personal gain," and also prohibits employees from "compet[ing] with the company directly or indirectly."

134.    Brown's and Lake's acts in using GEO Group's confidential information to prepare CFS's competing bid in response to RFP 200-1042-NE to obtain the BOP Contract are breaches of the Confidentiality provision of the Code of Ethics.   This provision requires employees to "maintain the confidentiality of confidential information entrusted to them by the Company[.]"  Confidential information is defined as "all non-public information that might be of use to competitors, or harmful to the Company or its customers, if disclosed."  Pursuant to the Code of Ethics, "[t]he obligation to preserve confidential information continues even after employment ends."

135.    GEO Group has been damaged as a result of Brown's, Lake's and Dabo's breaches of contract in an amount to be determined at trial.

**COUNT TEN**

**CONVERSION (AGAINST CFS AND BROWN)**

136.    GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

137.    GEO Group owns the proposal preparation materials and information used to prepare its response to RFP 200-1042-NE, including the prior work product of CSC.

138.    Defendants took unauthorized possession of GEO Group's proposal preparation materials and information and used these documents and data for their own purposes and to benefit CFS, in derogation of CFS's rights.

139.    Defendants acted with malice and willful disregard for GEO Group's rights.

140.    GEO Group has been damaged as a result of Defendants' acts of conversion in an amount to be determined at trial.

## COUNT ELEVEN

## UNJUST ENRICHMENT (AGAINST CFS AND BROWN)

141.  GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

142.  Defendants received a benefit from their use of GEO Group's proposal preparation materials and information to prepare CFS's own proposal.  CFS obtained the BOP contract award because it used and misappropriated GEO Group's own proposal preparation materials and information.

143.  Defendants received this benefit at GEO Group's expense, receiving the value of GEO Group's proposal preparation materials and information.

144.  Defendants have not compensated GEO Group for the value of the benefit they obtained.

145.  Equity and good conscience require restitution to GEO Group of the profits Defendants will earn from the BOP contract based on improper use of GEO Group's proposal preparation materials and information.

146.  Defendants should be disgorged of their unjust enrichment from the BOP contract profits in an amount to be determined at trial.

## COUNT TWELVE

## CIVIL CONSPIRACY (AGAINST CFS, BROWN, LAKE, AND DABO)

147.  GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

148.  As alleged above, Defendants committed the torts of unfair competition, misappropriation of confidential information, misappropriation of trade secrets, fraud, interference with prospective contract, and conversion against GEO Group.

- 27 -

149.    Lake and Dabo conspired with Defendants to further these tortious acts.

150.    In furtherance of this conspiracy, Brown, Lake and Dabo all remained employed by GEO Group for some period while also secretly working for CFS.  Furthermore, Brown and Lake obtained access to confidential, proprietary and trade secret information of GEO Group by failing to divulge the fact that they were working secretly for a competitor, CFS.  Furthermore, Brown and Lake falsely told GEO Group that there were no competitors submitting bids in response to RFP 200-1042-NE, although they knew or should have known that CFS would be submitting a competing bid.

151.    Together, on information and belief, CFS, Brown, Lake and Dabo prepared a competing bid in response to RFP 200-1042-NE that plagiarized GEO Group's own bid.

152.    As a result of the Defendants' and the Conspiracy Defendants' actions, GEO Group lost the BOP contract.

153.    GEO Group has been damaged as a result of Defendants' and the Conspiracy Defendants' acts of civil conspiracy in an amount to be determined at trial.

## COUNT THIRTEEN

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES (AGAINST LAKE AND DABO)

154.    GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

155.    As alleged above, Brown breached the fiduciary obligations he owed GEO Group.

156.    On information and belief, the Conspiracy Defendants knowingly induced or participated in Brown's breach of fiduciary duty by helping him use GEO Group's confidential, proprietary and trade secret proposal preparation materials and information to prepare a competing bid in response to RFP 200-1042-NE on behalf of CFS to obtain the BOP Contract.

- 28 -

Such acts substantially assisted Brown in breaching his fiduciary duties.

157.    GEO Group has been damaged as a result of the Conspiracy Defendants' aiding and abetting Brown's breach of fiduciary duties in an amount to be determined at trial.

## COUNT FOURTEEN

## AIDING AND ABETTING FRAUD (AGAINST LAKE AND DABO)

158.    GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

159.    As alleged above, Brown committed fraud against GEO Group.

160.    On information and belief, the Conspiracy Defendants knew of Brown's commission of this fraud and substantially assisted Brown in his commission of this fraud by withholding information from GEO Group regarding the existence of CFS and its preparation of a competing bid in response to RFP 200-1042-NE to obtain the BOP Contract.

161.    GEO Group has been damaged as a result of the Conspiracy Defendants' aiding and abetting Brown's fraud in an amount to be determined at trial.

## COUNT FIFTEEN

## AIDING AND ABETTING NEGLIGENT MISREPRESENTATION (AGAINST LAKE AND DABO)

162.    GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

163.    As alleged above, Brown committed negligent misrepresentation against GEO Group.

164.    On information and belief, the Conspiracy Defendants knew of Brown's commission of this negligent misrepresentation and substantially assisted Brown in his commission of this negligent misrepresentation by withholding information from GEO Group

regarding the existence of CFS and its preparation of a competing bid in response to RFP 200-1042-NE to obtain the BOP Contract.

165.    GEO Group has been damaged as a result of the Conspiracy Defendants' aiding and abetting Brown's negligent misrepresentation in an amount to be determined at trial.

## COUNT SIXTEEN

## AIDING AND ABETTING CONVERSION (AGAINST LAKE AND DABO)

166.    GEO Group realleges each allegation in each of the paragraphs above as if fully set forth herein.

167.    As alleged above, Defendants converted GEO Group's proposal preparation materials and information for their own use in preparing CFS's competing bid for the BOP re-entry services contract.

168.    On information and belief, the Conspiracy Defendants knew of Defendants' acts of conversion and substantially assisted them by using the GEO Group information and documents converted by Defendants to prepare a competing bid on behalf of CFS.

169.    GEO Group has been damaged as a result of the Conspiracy Defendants' aiding and abetting CFS's and Brown's conversion in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, GEO Group respectfully requests as relief in this action that the Court:

(i)  Enter an injunction against the Defendants and Conspiracy Defendants ordering them to immediately return any and all of GEO Group's confidential, proprietary and/or trade secret information in their possession;

(ii)  Enter a permanent injunction against the Defendants and Conspiracy Defendants, enjoining them from any further use of GEO Group's confidential, proprietary and/or trade secret information for any purpose;

(iii)  Order Defendants to disgorge the unlawful contract profits earned by CFS from the BOP contract;

(iv)  Award GEO Group actual damages against the Defendants and Conspiracy Defendants, jointly and severally, in an amount to be proven at trial but at a minimum in the amount of the profits lost to GEO Group from the BOP contract;

(v)  Award GEO Group compensatory damages against Brown, Lake and Dabo based on the compensation (including salary and bonuses) paid to them during the periods of their disloyalty to GEO Group in amounts to be proven at trial;

(vi)  Award GEO Group punitive damages against the Defendants and Conspiracy Defendants, jointly and severally, in an amount to be proven at trial;

(vii)  Award GEO Group prejudgment interest as provided by statute;

(viii)  Award GEO Group its attorneys' fees, expenses and costs; and

(ix)  Award GEO Group such other relief as the Court may deem just and proper.

### JURY DEMAND

GEO Group respectfully demands a trial by jury.

Dated: April 7, 2011

Respectfully submitted,

FULBRIGHT & JAWORSKI L.L.P.

By:_____
    Felice B. Galant
    666 Fifth Avenue
    New York, New York 10103
    Tel.: (212) 318-3000
    Fax: (212) 318-3400

Attorneys for Plaintiff The GEO Group, Inc.

OF COUNSEL:

Matthew H. Kirtland
Caroline M. Mew
801 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2623
Tel:  (202) 662-0200
Fax:  (202) 662-4643