UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
COMMUNITY FIRST SERVICES, INC. and
JACK A. BROWN, III,                                        **Index No.: CV 11-1711**
                                                                **(CBA)(MG)**
                              Counterclaim-Plaintiffs,

                                                          **COUNTERCLAIMS AND**
         -against-                                        **DEMAND FOR JURY**
                                                          **TRIAL**

THE GEO GROUP, INC.,

                              Counterclaim-Defendant.
-------------------------------------------------------------------X

### COUNTERCLAIMS AND DEMAND FOR TRIAL BY JURY

Counterclaim-Plaintiffs Community First Services, Inc. ("CFS") and Jack A. Brown, III

("Brown"), by and through undersigned counsel, Ohrenstein & Brown, LLP, as and for their

Counterclaims against Counterclaim-Defendant, The GEO Group, Inc. ("GEO"), hereby allege

as follows:

### NATURE OF THE CASE

1.       This case and these counterclaims arise out of the procurement, management,

operation of, and competition for, federal "Community Corrections" contracts to operate halfway

houses, or Residential Reentry Centers ("RRCs") (also known as Community Correction Centers

("CCCs")) for the United States Department of Justice, Federal Bureau of Prisons ("BOP").

2.       Counterclaim-Plaintiff Brown is, and has been, a Community Corrections

executive since approximately 1995. "Community Corrections" is an industry term which refers

to an alternative methodology to traditional incarceration-based corrections in favor of

community-based correction, rehabilitation, and education whose primary goal is the effective

operation of RRCs to integrate residents as valued and employed members into their local

communities. Brown has been employed in the Community Corrections field for the entirety of his two-decade private career following his service as a commissioned officer in the United States Army, including such service during Operation Desert Storm.

3.      Brown's erstwhile employment at GEO began in or around November 2005 when GEO acquired Community Services Corrections ("CSC") for which Brown had already been responsible for day-to-day operations of, among others, two local RRCs (the "Brooklyn RRC," at issue here, and the "Bronx RRC") for ten years.

4.      When GEO acquired CSC's RRCs, GEO had no Community Corrections experience and had never operated a single RRC before it purchased the right to do so from CSC.

5.      At all relevant times, GEO's specialty was as a for-profit private administrator of traditional prisons and jails, which in the United States are disproportionately populated with minorities, particularly young African-American ("Black") and Hispanic men.

6.      GEO's "private prisons" and "private jail operations" have been successful and have supported lavish lifestyles for its predominantly White male executive work force.

## JURISDICTION

7.      The matter in controversy exceeds $75,000, exclusive of interests and costs, is between citizens of different states, and the Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a).

8.      In addition, the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1343 and pendent jurisdiction over any counterclaims that would not trigger original diversity jurisdiction.

## PARTIES

9.      Counterclaim-Plaintiff CFS is a minority owned 501(c)(3) New York Not For Profit Corporation with a principal place of business in Brooklyn, New York.

2

10.     Counterclaim-Plaintiff Brown is the owner and CEO of CFS and a citizen of New York.

11.     Counterclaim-Defendant GEO is a publicly traded for profit corporation (NYSE: GEO) organized under the laws of the State of Florida, with a principal place of business in Boca Raton, Florida.

## FACTUAL ALLEGATIONS

### Brown's Community Corrections Experience and GEO's Acquisition of CSC

12.     From approximately 1992 through approximately November 2005, Brown was employed by CSC or its predecessors in the City of New York.

13.     From approximately 1995 onward, Brown was employed at an executive level at CSC.

14.     In November 2005, Brown was CSC's Vice President of Community Corrections, and was responsible for all aspects of running, managing, supervising, and overseeing, *inter alia*, the day-to-day operations of CSC's RRCs, including the Brooklyn RRC and the Bronx RRC. CSC had been operating these facilities in or around 1991 as RRCs for the BOP and won contracts to do so through competitive procurements.

15.     CSC's employee, Carol Kichen, wrote CSC's successful bids for both the Brooklyn and Bronx RRCs in response to competitive procurements issued by the BOP.

16.     In November 2005, GEO acquired CSC and its RRCs (the "Acquired Facilities" or "Acquired RRCs") and certain CSC employees, including Brown, but not including Carol Kichen.

17.     Upon information and belief, prior to its acquisition of CSC in 2005 GEO had no extant Community Corrections division, unit or operations that ran RRCs or "Halfway Houses."

3

During Brown's employment with GEO, GEO did not expand its RRC operations beyond those acquired from CSC.

18.     To secure contracts such as those from the BOP to run RRCs or Halfway Houses, as pertinent here, a contractor must respond to a Request for Proposal ("RFP"), which typically requires the submission of third-party "Community Support" letters from local community leaders offering support of the proposal and service provider. The local community support for the RRCs arose out of personal and professional relationships that Brown had with local community leaders.

19.     Accordingly, due to the community support for Brown, GEO hired him as an employee within the City of New York where it had more than four (4) employees at all relevant times.

20.     GEO gave Brown the title Vice President of Community Corrections.

### The Conflict Between Incarceration and Community Corrections

21.     Like most prisons and jails in this country, GEO's facilities disproportionately house minority populations, specifically young Black and Hispanic men.

22.     In 2011, GEO's gross revenues were in excess of $1.5 billion dollars, which was primarily generated by operating "for-profit" prisons and jails. Predominantly, the larger the "bed" count of its prison and jail populations, the more money governmental entities such as the federal BOP pays GEO.

23.     "Recidivism" enlarges GEO's profit potential from its principal operations, while community residential re-entry services provided through RRCs such as those run by Brown, CFS and CSC, before acquisition by GEO, are designed not just to reduce the populations of prisons and jails, but to reduce recidivism.

4

### Brown's Efforts to Integrate Himself and Community Corrections Into GEO

24.    Despite his success in the Community Corrections field and the success of the Acquired Facilities, Brown was subjected to discrimination, prejudice, ostracism, and harassment as the only Black executive level employee at a corporation dominated by Southern White executives.

25.    Brown repeatedly attempted to integrate himself, and to improve the RRC services GEO expected from him, due to his core alternative correctional expertise. However, Brown's efforts were consistently met with hostility, silence, ridicule, and ultimately rejection.

26.    For example, from 2005 onward, Brown repeatedly requested a job description for GEO's "Vice President of Community Corrections," his job and title, which GEO never provided. Further, GEO made little or no effort to hide the fact that Brown was a Vice President in name only.

27.    For example, GEO initially directed Brown to report to another non-supervisory "peer" Vice President, even though no other Vice President within GEO reported to another peer Vice President. When this "peer" declined to be responsible for supervising Brown, GEO in form had Brown report to a Senior Vice President. However, to the extent Brown remained responsible for overall facility oversight, GEO required Brown to actually report to its pre-existing Regional Business Manager, Angela Meister, notwithstanding that Brown was a senior level officer superior to Ms. Meister.

28.    Under GEO's pre-existing corporate structure, Vice Presidents did not report to Regional Managers. Instead, Regional Managers reported to Vice Presidents, and Vice Presidents reported to the Senior Vice President. GEO's creation of this reporting structure for Brown was thus a departure from its standard business practices which it applied only to Brown.

29.     Additionally, GEO required the employees at the Acquired Facilities, such as the facility administrators and assistant administrators, to report to the pre-existing GEO Regional Managers, but not to Brown.

30.     Further, the Regional Business Manager treated Brown and the employees at the Acquired Facilities with open hostility to the detriment of the Acquired Facilities, their residents, and the taxpayers who ultimately funded the contracts for the RRCs.

31.     While Brown's title stayed the same, GEO removed him from "line authority" amounting to a *de facto* demotion.

32.     While Brown continued as GEO's Vice President of Community Corrections, he was ostracized from GEO, its corporate culture, and not allowed to integrate.

33.     During Brown's tenure, GEO, its agents, Brown's peers, and even GEO's lower level pre-existing employees created and used derogatory nicknames for him such as "Vice President of Irrelevancy" and "Jack in the Box."

34.     Despite all of this, Brown operated the Acquired Facilities profitably for GEO's benefit.  However, rather than work with and integrate Brown, GEO endeavored to replace Brown with a less qualified White GEO executive.

35.     In or around the Spring of 2006, GEO held a corporate conference in Santa Monica, California.  After discovering that the Acquired Facilities were profit centers, with Brown in the audience and despite his prior efforts to secure a role for Community Corrections at GEO, GEO's Chief Executive Officer, George Zoley ("GEO CEO" or "Zoley"), called for a volunteer to take GEO to the "next level" of Community Corrections.

36.     Brown was qualified to lead GEO's Community Corrections initiative.  In fact, Brown was already doing so as Vice President for Community Corrections.

6

37. Brown volunteered, and personally spoke with Zoley to propose that he lead a collaborative venture for GEO in the Community Corrections field to marry his expertise with GEO's resources.

38. Zoley refused to consider Brown for any such position but placated Brown by suggesting he "put a business proposal together."

39. Brown drafted a business plan outlining his vision for GEO in the future of Community Corrections entitled *A Development Plan for A Transitional Services Division 'The Future of Corrections'* and sent it personally to Zoley. Zoley never bothered to respond to Brown concerning his business plan.

40. The following year, a GEO Senior Vice President advised Brown that GEO was not "interested in his" plan because it did not "fit" into GEO.

### Brown's Role in GEO's "Rebids," RFI and RFP 200-1042 NE

41. When the acquired contract for the Bronx RRC came up for renewal in around early 2007, GEO put together a "rebid" (the "Bronx Rebid") to secure its revenue source but specifically limited Brown's involvement in the process even though he had been managing the facility since 1995.

42. The only role GEO asked Brown to play in the Bronx RRC rebid was to secure the necessary community support for GEO as the "face" of the Bronx RRC. No other executive level employee or Vice President at GEO was relegated to liaising with local community leaders to obtain support letters when GEO needed them.

43. In November 2008, the BOP issued a Sources Sought Notice or "SSN" entitled Request for Information or RFI 200-1042-NE. A SSN is simply a vehicle the agency uses to solicit information and survey potential service providers for a BOP contract.

44. GEO submitted a response to RFI 200-1042-NE as an interested service provider.

7

45.     CFS did not respond to RFI 200-1042-NE.

46.     In January 2009, the BOP issued RFP 200-1042-NE (the "Brooklyn RFP" and "Brooklyn Rebid") for the Brooklyn RRC.  Despite its recent allegations to the contrary, GEO again limited Brown's role in the proposal process and instead assembled a team with more than a dozen employees to make its proposal by "revising" Kichen's prior proposal for CSC's prior contract with BOP for the Brooklyn RRC.

47.     As relevant here, the RFP includes detailed specifications for the contract called a "Statement of Work."  Proposals must not only include Community Support letters, but must identify a proposed facility and local community resources available to residents as well as "Local Area Community Concerns," which is a list of all concerns such as schools, day care centers, and other sensitive facilities with ½ mile of the proposed facility.

48.     In late January 2009, Brown took vacation time to attend the inauguration of President Barack Obama, the country's first Black President.  During that long Martin Luther King weekend, executives harassed Brown with work emails purportedly seeking assistance on fabricated emergencies related to the RFP, even though they knew Brown was taking personal vacation time to attend this historic event.

**Brown's March 13, 2009 Resignation and GEO's Fruitless Investigation**

49.     Throughout Brown's tenure at GEO, Brown had limited access to Zoley.  Indeed, Brown endeavored to speak directly with Zoley to discuss the future of Community Corrections at GEO with little or no success until March 2009 when Brown determined to make one last effort to either integrate himself into GEO or to work independently, but in partnership with, GEO.

8

50.     Accordingly, Brown formulated two alternative proposals to present to Zoley: (a) to implement his prior business plan for growing Community Corrections within GEO, to be headed by Brown; or (b) to create a joint venture with GEO, with Brown as one of its principals.

51.     On March 13, 2009, Brown spoke with Zoley about the future of Community Corrections at GEO and what his role would be, and presented his proposals. First, Brown brought up his 2006 business plan and asked if GEO intended to pursue it. Zoley said no. Brown then proposed that he and GEO create a joint venture to marry his Community Corrections expertise with GEO's resources in which Brown would be a principal. Despite the fact that Zoley had publicly called for assistance to lead just such an initiative, Zoley told Brown no. Finally, Brown suggested that since GEO was apparently not committed to expanding Community Corrections/RRCs, Brown suggested that GEO allow Brown to "buy-out" the Acquired Facilities. Zoley refused each and every entreaty.

52.     Zoley specifically told Brown that his future at GEO would be limited to getting GEO the necessary local community support to continue to operate the New York RRCs.

53.     Brown therefore told Zoley directly that he could not get community support for a company that he did not support himself and he resigned.

54.     Realizing that it had potentially disrupted its relations with the community and, therefore, the BOP, with which GEO had other contracts, immediately upon Brown's resignation GEO undertook an extensive internal investigation in a desperate effort to find evidence that Brown was "stealing" GEO's proprietary material, that involved searching Brown's work computer, his emails, its corporate server, his office files and interviewing his co-workers and colleagues in New York -- all to no avail.

9

55. GEO discovered no evidence that Brown took any confidential, proprietary or other trade secret information because Brown never took any of those from GEO.

### GEO's Advance Guard: The First False
### Accusation to the BOP on March 16, 2009

56. On March 16, 2009, GEO submitted its proposal to the BOP for the Brooklyn RFP.

57. After Brown resigned, GEO eliminated his position and lowered its final pricing proposal that it submitted to the BOP.

58. Despite the fact that its own internal investigation revealed nothing of the sort, GEO reported to the BOP that Brown had resigned under questionable circumstances and that:

> We have since discovered that Mr. Brown emailed copies of company-confidential information, including the Brooklyn RFP and associated internal correspondence to an outside third-party, which we believe constitutes a violation of trade secret laws and a breach of his fiduciary obligations to our company.

59. Of course, GEO discovered no such thing. The only thing GEO discovered during its internal investigation was that Brown had sent copies of the public announcement of the Brooklyn RFP posted on www.fedbizzopps.gov to himself and to his wife.

60. On March 16, 2009, GEO had no reasonable basis to believe that Brown took any confidential information or violated "trade secret" laws, but made the charge anticipating that Brown would compete for the Brooklyn RRC contract in an effort to break and bankrupt Brown and CFS.

### CFS's March 18, 2009 Proposal

61. Based on the treatment he had received during his tenure at GEO, and GEO's lack of commitment to Community Corrections, Brown resigned because he could not in good faith work for a company he did not support and decided to compete for the Brooklyn RRC contract by submitting a bid through CFS.

62.    Upon his resignation, Brown retained Ms. Kichen to write CFS's bid proposal for the Brooklyn RRC contract.

63.    Until Brown's resignation, CFS had never been in competition with GEO.

64.    Having worked in the region for nearly twenty years, Brown knew where and how to target potential facilities to accommodate an RRC site and initially located a facility at Willoughby Avenue in Brooklyn (the "Willoughby Facility").

65.    Brown secured an option to lease the Willoughby Facility at a very attractive price, but had to assume costs of renovations and improvements to bring the structure up to code and render it useable as an RRC.   The amount of these investments approximately total $520,000.

66.    Having managed RRCs in an executive capacity since 1995, including the Brooklyn RRC and others for nearly that same amount of time, Brown knew the types and approximate costs and expenses required to create forecasts and budgets.

67.    Finally, as an experienced bid writer, Ms. Kichen was adept at using the BOP's own Statement of Work -- a public document included in the RFP -- as a basis to draft her proposal just as she did when she wrote the original successful proposals for CSC.

68.    Accordingly, CFS successfully completed a proposal in response to RFP 200-1042-NE within the deadline and submitted its proposal on March 18, 2009.  CFS's proposal was ultimately the successful proposal accepted by BOP.

### The Federal Investigation Into CFS's Bid for Alleged PIA and Bid Rigging Violations

69.    Due to the apparent gravity of GEO's (false) March 16, 2009 allegations and in conjunction with the fortuitous fact that GEO itself had simply reused CSC's prior original proposal that Ms. Kichen had written for CSC, causing CFS's and GEO's proposals to look and

11

read the same, the BOP halted the procurement process and referred GEO's allegations to the Department of Justice Office of Inspector General ("DOJ OIG") for possible bid rigging and Procurement Integrity Act ("PIA") violations.

70.     Two special agents from DOJ OIG conducted an investigation and liaised directly with GEO General Counsel John Bulfin, who provided the agents with Brown's work computer and emails as well as access to GEO employees including GEO's NE Regional Business Manager, who specifically told the federal agents that she did not share any pricing data with Brown.

71.     The agents interviewed Brown and learned of Ms. Kichen's involvement -- for both CFS and CSC -- which, along with the fact that both GEO and CFS were responding to the same Statement of Work, explained the structural similarities between CFS's and GEO's proposals.  The agents interviewed Ms. Kichen directly who shared and explained her work for them and showed them how CFS's bid, in fact, mirrored the BOP's statement of work.

72.     DOJ OIG found:  (a) no evidence that Brown took any corporate property or confidential information; (b) no evidence that any element of CFS's proposal had been derived from GEO's proposal; and (c) that GEO could not substantiate any of its allegations against Brown.

73.     BOP, therefore, resumed the competition, during which GEO modified its pricing three times.

74.     GEO never had a factual basis to allege that Brown knew, saw, or had access to its final per diem pricing that the BOP actually considered with GEO's revised proposal.

### GEO's Flank Assault on CFS:  The Bid Protest Campaign Begins

75.     On February 16, 2011, the BOP awarded CFS the Brooklyn RRC contract as a better value to the tax payers.

12

76. On February 28, 2011, GEO commenced an agency level bid protest.

77. Upon information and belief, GEO's "evidence" at the agency level included Brown's emails to his wife of the <u>publicly available</u> SSN announcement, GEO's allegations that Brown "must have" taken confidential trade secret information and its draft proposal by virtue of its successful bid even though its own internal and DOJ OIG investigations revealed no factual support for these claims.

78. GEO ignored the findings and forensic investigation of the DOJ OIG. Further, GEO ignored the fact that, as it learned from the DOJ OIG, that any similarities between CFS's bid and its own was due to the fact that Ms. Kichen, who wrote CFS's proposal, had been the author of the CSC proposal GEO had used as a template for making their proposal.

79. GEO not only ignored these facts but relied on changed testimony from its NE Regional Business Manager -- testimony that was directly opposite to what she had previously told the federal agents -- that she had <u>not</u> shown GEO's pricing information to Brown.

80. GEO further ignored the fact that <u>after Brown resigned</u> it modified its pricing multiple times.

81. GEO ignored the fact that CFS was a small, local, not-for-profit corporation, that had no need for a profit margin, no shareholders, no SEC filings and compliance budget, and, unlike GEO, CFS actually had over two decades of executive Community Correction experience, through Brown.

82. GEO ignored the foregoing explanation as to how Brown and CFS were able to prepare a lower priced proposal than GEO, after Brown resigned, without taking any proprietary or trade secret material from GEO. GEO ignored these facts and commenced the bid protest without probable cause but with a specific intent to bankrupt CFS, its only competition in New

York, and drive Brown, formerly the only Black Vice President of GEO, and who had the temerity to resign and compete with GEO, out of the field.

83.    GEO's agency level bid protest triggered an automatic forty-five (45) day stay of contract while BOP investigated and rendered its decision.

84.    As a direct result of GEO's bid protest, CFS lost the advantageous option to lease the Willoughby Facility and the money invested to upgrade the facility.

### GEO Appeals the BOP Denial of Its Agency Level Bid Protest to the U.S. Government Accountability Office Without Any Reasonable Belief in or Factual Support for Its Position

85.    On April 8, 2011, the day after GEO commenced the instant civil action, BOP denied GEO's bid protest finding that GEO could not substantiate any of its allegations and that DOJ OIG's thorough investigation of witnesses, documents and computers revealed no evidence of any theft of corporate property let alone confidential or proposal information. For the second time, federal agents advised GEO directly that its allegations were not only unsubstantiated but that they did not even comprise a cognizable bid protest:

> The Protest alleges first, that Brown and/or CFS violated the [PIA] and second, that CFS had an unequal access to information resulting in an Organization Conflict of Interest ("OCI") that should have precluded the award to CFS. However, GEO Group failed to support either of these allegations with credible evidence or specific facts. . . . Neither of these allegations were substantiated by OIG after its investigation.

86.    As a result of the award: (a) the BOP lifted the stay and ordered CFS to begin to "ramp-up" to assume operations in August 2011, and (b) GEO "doubled-down" and immediately filed an appeal with the U.S. Government Accountability Office ("GAO") on April 18, 2011.

87.    GEO could have then proceeded directly to the Court of Federal Claims to ask for an injunction but doing so would have expedited its ultimate loss and reduced the cost to Brown

14

and CFS to defend themselves. Accordingly, GEO first voluntarily detoured its bid protest to the GAO to increase delay and increase costs as much as possible for CFS and Brown.

88.    First, following BOP's denial of GEO's bid protest, CFS for the second time -- providing yet more evidence of its ability to respond and act on short notice -- found a suitable location for its Brooklyn RRC on Atlantic Avenue (the "Atlantic Facility") and signed an agreement at a significant increased cost over the proposed Willoughby Facility of approximately $975,000 per year.

89.    Second, because the Atlantic Facility was a vacant former hotel, CFS was forced to expend additional and significant costs in bringing the facility up to code, obtaining a mandatory Certificate of Occupancy, upgrading the electrical and HVAC systems, make significant plumbing repairs, and installing elevators subject to city permits which additional expense CFS would have avoided but for GEO's spurious bid protest.  These costs total approximately $350,000.

90.    While CFS began to ramp-up for the transition of the contract, GEO immediately prepared and filed its GAO appeal predicated upon express speculation and the same incredible testimony that it used before the BOP.

91.    On April 18, 2011, GEO appealed the BOP's denial of its Agency Level Bid Protest and now publicly accused Brown of stealing its confidential trade secret information to plagiarize its own bid and underbid GEO.

92.    On April 22, 2011, CFS intervened in GEO's appeal to protect its rights, interest, and awards following which GEO continued its appeal.

93.    On appeal to the GAO, however, the BOP itself submitted a report explaining its position detailing its view of the bid protest for the GAO's review.  Accordingly, for the third

<u>time</u> a federal agency specifically made clear that GEO had no "bid protest" and that its allegations were unsupported by any credible evidence.

94.    In pertinent part, the BOP not only adopted DOJ OIG's conclusion that Brown had stolen nothing proprietary or confidential from GEO, it explained further that the alleged critical pieces of information that Brown allegedly "stole" from GEO -- its "per diem" rate and staffing plans -- were publicly available, not proprietary, and even if CFS had access to such information, that information would not have provided CFS with a competitive advantage.

95.    BOP reviewed each piece of information GEO contended was confidential or "proprietary trade secret proposal" information and found none of it was due protection under federal law, none of it would have provided CFS with a competitive advantage, and GEO could not demonstrate that it was somehow prejudiced even if CFS had such information during the competition -- which neither GEO nor the federal government could find any evidence to support such a finding.

96.    BOP is the only agency that determines what proposed information is material and advantageous, findings which can only be challenged if arbitrary or capricious.

97.    On or around April 25, 2011, the BOP moved to dismiss GEO's appeal.

98.    On June 3, 2011, GEO continued its appeal and requested a hearing and leave to submit additional documentation and opposed the BOP's motion to dismiss GEO's appeal.

99.    On appeal, GEO accused Brown of fraudulently gaining access to its proposal pricing information and purloining GEO's staffing plans to strategically reduce its own labor costs to underbid GEO.

100.    GEO once again ignored the fact that Brown never saw or even had access to its per diem pricing that it actually submitted to the BOP.

101.   GEO ignored the fact that its current Brooklyn RRC per diem pricing and constituent elements were published on the BOP's website and are publicly available.

102.   GEO ignored the fact that federal procurement law did not treat the staffing plans Brown allegedly stole as proprietary.

103.   GEO ignored the fact that Brown had been acting at the executive level and creating and approving those staffing plans for a Brooklyn RRC for BOP for nearly fifteen (15) years.

104.   GEO ignored the fact that both its own internal investigation and the federal investigation revealed its allegations were not substantiated with any credible evidence.

105.   GEO ignored the fact that its star witness, in sum and substance, simply changed her statement and asserted that she had shown Brown a draft of its per diem pricing that GEO later changed three times after Brown resigned, notwithstanding that she had told federal investigators from the DOJ OIG that she had never even shared that with Brown.

106.   Accordingly, the GAO denied GEO's appeal on July 26, 2011.  Thus, for the fourth time a federal agency "point blank" told GEO its allegations were unsupported, and even if credited, did not trigger any federal protection or merit a protest citing:

a.     That DOJ OIG did not find any evidence that elements of CFS's proposal had been derived from any of GEO's information;

b.     That CFS's proposal had been prepared by a third-party private proposal writer;

c.     That none of the proffered information was proposal information or source selection information;

d.     That even if it credited the manager's new testimony, it would not trigger PIA violations under the savings clause because GEO was free to voluntarily disclose its own information and pursue any alleged civil remedies for alleged misuse;

17

e.       That GEO could not demonstrate that CFS obtained non-public information that would have created a competitive advantage as required by federal procurement law; and

f.       That there was no credible evidence that any aspect of CFS'S proposal was derived from any element of GEO's.

**GEO Continues Its "Scorched Earth" Attack Against CFS and Brown:
GEO's Action in the U.S. Court of Federal Claims Against the
United States, Seeking a TRO, Preliminary and Permanent Injunctions**

107.    The following day GEO sued the U.S. Government and moved by Order to Show Cause for a TRO seeking, *inter alia*, an injunction to prevent the turnover of the contract scheduled for August 1, 2011, a hearing, discovery, and permanent injunction of CFS's award. As part of the Court of Federal Claims Procedures, CFS was made an interested party, and at its own cost participated in the proceedings.

108.    GEO waited until the eve of transition from the GEO RRC to the CFS RRC to move for an injunction, even though (as the Court of Federal Claims would point out) it could have done so months prior.  GEO did so simply to prolong the litigation and inflict as much possible damage on CFS, a small start-up, in an effort to bankrupt its competition and drive Brown out of business.

109.    On July 28, 2011, CFS lawfully intervened in GEO's bid protest before the Court of Federal Claims to defend its rights, interests, and award.

110.    GEO thereafter continued its bid protest before the Court of Federal Claims even though it knew that it had no case -- as its subsequent actions demonstrate.

111.    On July 29, 2011, the Court of Federal Claims predictably denied GEO's motion for a TRO and, <u>for the fifth time</u>, a federal agency, this time in court, plainly advised GEO that it had no case.

112.    The Court of Federal Claims thus held "the <u>absence of any indicated likelihood of success on the merits</u> [emphasis added], as well as the balancing of harms and the public's interest, leave little doubt in the Court's mind that the pending application should be denied."

113.    The Court specifically held that even a "preliminary review" of GEO's theory demonstrated it could not prevail because GEO could not even allege that the government participated in any of the purported wrongdoing as would be necessary to sustain a bid protest:

a.          "For one thing, there is no indication that Mr. Brown's actions gave rise to a violation of the Procurement Integrity Act" because the Act only targets government conduct and

b.          "Here, of course, Mr. Brown did not obtain the information in question from BOP or any other government source, but rather [allegedly] from GEO itself;

c.          "In addition, GEO appears wrong in contending that Mr. Brown's actions gave rise to an unmitigated organizational conflict of interest. . . . There is no indication—and plaintiff cites no authority to this effect—that such a conflict arises when an individual takes information about his former employer to his new employer."

d.          "Should this case proceed, much more will need to be shown to demonstrate that plaintiff is entitled to relief."

e.          "GEO has admitted that it knew that the timing of the GAO decision was such that it would have, at best, a few days before the termination of the existing contract in which to file suit in this court and obtain a temporary restraining order. Had it filed suit a month or so earlier, its suit in this court could have been fully resolved before the existing contract expires. But, it did not. And the court is ill-inclined, at this late hour, to pull GEO's chestnuts out of a fire <u>sparked by its own ill-fated tactical decisions.</u>" (Emphasis added.)

114.    GEO persisted and filed its motion for summary judgment on the administrative record on August 26, 2011 before the Court of Federal Claims. However, on the eve of a final decision on the merits, GEO voluntarily withdrew the complaint with prejudice.

115.    GEO did so solely to avoid potentially preclusive findings of fact and conclusions of law.

19

## COUNT ONE

## MALICIOUS PROSECUTION OF CFS BY GEO

116.    Counterclaim-Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "115" as if herein set forth at length.

117.    GEO commenced its bid protest on February 28, 2011 at the Agency level, commenced and continued its protest on April 18, 2011 before the GAO, continued its bid protest after CFS intervened on April 22, 2011, continued its bid protest on June 3, 2011 by opposing the BOP's motion to dismiss and requesting, *inter alia*, a hearing, commenced and continued its protest on July 26, 2011 before the United States Court of Federal Claims, continued its bid protest after CFS intervened on July 28, 2011, and continued its bid protest by moving for summary judgment on the administrative record on August 26, 2011 (those dates hereinafter the "foregoing dates").

118.    On each of the foregoing dates, GEO sought various relief such as "discovery," hearings, or injunctive relief setting aside CFS's contract.

119.    On each of the foregoing dates, GEO commenced or continued its actions against CFS, its interest, property or rights.

120.    On each of the foregoing dates, GEO knew that Brown had, as of March 18, 2009, approximately fifteen (15) years of executive level experience as the "chief executive" at the Brooklyn RRC.

121.    On each of the foregoing dates, GEO itself was an experienced government contractor at the federal, state and local level throughout the country.

122.    On each of the foregoing dates, GEO knew that federal agents from the DOJ OIG had reviewed Brown's GEO issued work computer and emails and found no evidence of any corporate theft.

123.    On each of the foregoing dates, GEO had no reasonable basis to believe that it had evidence that Brown took confidential, trade secret, or proprietary information as alleged in its bid protest, that its internal investigation revealed no such evidence, and that its computer and email servers contained no such evidence.

124.    On each of the foregoing dates, GEO knew that CFS hired Ms. Kichen as a freelance bid writer to write CFS'S Brooklyn RRC 2009 proposal.

125.    On each of the foregoing dates, GEO knew that GEO itself had reused CSC's prior successful bid that Ms. Kichen had written for CSC in making its own 2009 proposal.

126.    On each of the foregoing dates, GEO had no reasonable basis to believe that anyone acting on its behalf shared pricing information for its 2009 proposal with Brown before he resigned.

127.    On each of the foregoing dates, GEO knew that it had changed its pricing information for its 2009 proposal multiple times after Brown resigned.

128.    On each of the foregoing dates, GEO had no reasonable basis to believe that Brown ever saw, or had access to its final pricing information that GEO submitted to the BOP on March 16, 2009, or the pricing that BOP had actually considered with GEO's proposal.

129.    GEO therefore had no probable cause to commence or continue its bid protest on the foregoing dates.

130.    On each of the foregoing dates and throughout the bid protest, GEO knew that its then-current per diem pricing information for the Brooklyn RRC was published on the BOP website and was publicly available, and could be used by a competitor to lawfully compete with GEO's bid.

21

131. On each of the foregoing dates and throughout the bid protest, GEO knew that its final per diem price that it submitted to the BOP was substantially similar to the per diem pricing information published online at the BOP website.

132. On each of the foregoing dates, and throughout the bid protest, GEO knew that its final per diem pricing information for its 2009 proposal could be replicated from publicly available information.

133. On each of the foregoing dates and throughout the bid protest, GEO knew that the BOP would not consider federal contractors' staffing information to perform under federal contracts proprietary information.

134. On each of the foregoing dates, GEO's bid protest relied on the theory that Brown's access to and knowledge of its final proposed per diem and staffing plans allowed Brown to "underbid" GEO -- notwithstanding that after Brown resigned from GEO, GEO changed its pricing multiple times.

135. On each of the foregoing dates, GEO's bid protest relied on the theory that Brown stole proposal information to plagiarize CFS's bid.

136. On each of the foregoing dates, GEO knew that a federal contractor had no right to challenge an agency award of a federal contract under federal procurement law based upon alleged civilian conduct that did not implicate government officials.

137. On each of those foregoing dates, GEO knew that a federal contractor had no right to challenge an award under federal procurement law unless it could allege actual involvement or wrongdoing by a government official.

138. On each of those foregoing dates, GEO had no reasonable basis to believe that none of the information it proffered to BOP, GAO, and the Court of Federal Claims as entitled to

protection was confidential, proprietary, or trade secret information under federal procurement law or regulations.

139. On each of the foregoing dates, GEO knew that BOP had acted reasonably and lawfully within its discretion in awarding the Brooklyn RRC contract to CFS and rejecting its bid protest.

140. On each of the foregoing dates, GEO had no reasonable basis to believe that BOP had acted arbitrarily or capriciously in so doing.

141. On each of the foregoing dates, GEO had no reasonable basis to believe that its draft and final response to the BOP's SSN for RFI 200-1042-NE contained confidential, trade secret or proprietary information under federal procurement law or regulation.

142. On each of the foregoing dates, GEO had no reasonable basis to believe that its proposal outline for RFP 200-1042-NE contained confidential, trade secret or proprietary information under federal procurement law or regulation.

143. On each of the foregoing dates, GEO had no reasonable basis to believe that CSC's Brooklyn Facility Staffing Plan from the last proposal contained confidential, trade secret or proprietary information under federal procurement law or regulation.

144. On each of the foregoing dates, GEO had no reasonable basis to believe that its Bronx Facility Staffing Plan from its last proposal contained confidential, trade secret or proprietary information under federal procurement law or regulation.

145. On each of the foregoing dates, GEO had no reasonable basis to believe that its Bronx Facility Weekly Schedule from its last proposal contained confidential, trade secret or proprietary information under federal procurement law or regulation.

146.    On each of the foregoing dates, GEO had no reasonable basis to believe that its Bronx Facility Personnel Resources from its last proposal contained confidential, trade secret or proprietary information under federal procurement law or regulation.

147.    On each of the foregoing dates, GEO had no reasonable basis to believe that its Bronx Facility community support letters from its last RRC rebid contained confidential, trade secret or proprietary information under federal procurement law or regulation.

148.    On each of the foregoing dates, GEO had no reasonable basis to believe that its Bronx Facility Community Relations Plan from its last RRC rebid contained confidential, trade secret or proprietary information under federal procurement law or regulation.

149.    On each of the foregoing dates, GEO had no reasonable basis to believe that CSC's Community Resources Directory from its last Brooklyn Facility RRC rebid contained confidential, trade secret or proprietary information under federal procurement law or regulation.

150.    On each of the foregoing dates, GEO had no reasonable basis to believe that CSC's Local Area Concerns document from its last Brooklyn Facility RRC rebid contained confidential, trade secret or proprietary information under federal procurement law or regulation.

151.    On each of the foregoing dates, GEO had no reasonable basis to believe that its pricing proposal information from its response to RFP 200-1042-NR contained confidential, trade secret or proprietary information under federal procurement law or regulation and was easily replicated from publicly available information.

152.    On each of the foregoing dates, GEO had no reasonable basis to believe that its per diem rates for its response to RFP 200-1042-NE contained confidential, trade secret or proprietary information under federal procurement law or regulation, and GEO knew its 2009 pricing was easily replicated from publicly available information

24

153.    On each of those foregoing dates, GEO commenced and continued its bid protest not to win but solely and maliciously to inflict injury upon CFS, delay the source of revenue for CFS, increase CFS'S costs of performance, and to drive Brown out of business.

154.    GEO commenced and thereafter continued its bid protest because Brown is a Black man.

155.    As result of the delay in the transition of the Brooklyn RRC contract to CFS during its bid protest, CFS incurred significant investment losses at the Willoughby Facility and significant increased expenses at the Atlantic Facility.

156.    As result of the delay GEO's bid protest caused, CFS incurred future <u>annual</u> expenses of nearly one million dollars throughout the life of the Brooklyn RRC contract.

157.    The Brooklyn RRC contract will last five years.

158.    CFS and Brown therefore suffered special injury.

159.    Wherefore, Counterclaim-Plaintiffs pray for Judgment of this Court directing GEO to pay fair and just compensation for the damages the bid protest inflicted upon CFS and Brown including actual losses, future expenses, injury to Brown's reputation, humiliation, mental anguish, inconvenience, and reasonable attorney's fees, in an amount to be proven at trial but not less than $6,000,000 plus punitive damages.

## COUNT TWO

## PRIMA FACIE TORT UPON CFS AND BROWN BY GEO

160.    Counterclaim-Plaintiff Brown repeats and realleges each and every allegation set forth in paragraphs "1" through "159" as if herein set forth at length.

161.    GEO commenced and continued its bid on the foregoing dates and as a result CFS and suffered financial loss in that CFS lost the use of revenue under the BOP contract, lost the

option lease the Willoughby Facility, lost its investments therein and was caused to incur substantial increased costs in securing the right to use the Atlantic Facility

162.   GEO acted solely out of personal animus, spite, malice and malevolence against Brown as CFS.

163.   GEO commenced and continued its bid protest without justification and solely to harm CFS and Brown.

164.   GEO's bid protest commenced and continued on each of the foregoing dates caused substantial injury to Brown and CFS.

165.   Wherefore, Counterclaim-Plaintiffs pray for Judgment of this Court directing GEO to pay fair and just compensation for the damages the bid protest inflicted upon CFS and Brown including actual losses, future expenses, injury to Brown's reputation, humiliation, mental anguish, inconvenience, and reasonable attorney's fees, in an amount to be proven at trial but not less than $6,000,000 plus punitive damages.

## COUNT THREE

### DISCRIMINATION UNDER NEW YORK HUMAN RIGHTS LAW BY BROWN

166.   Counterclaim-Plaintiff Brown repeats and realleges each and every allegation set forth in paragraphs "1" through "159" as if herein set forth at length.

167.   Brown is a member of a protected race class under the State Human Rights Law.

168.   Brown was qualified to hold an executive level Vice President position at GEO.

169.   Brown was the most qualified executive at GEO to run the Brooklyn and Bronx RRCs.

170.   Brown was the most qualified executive at GEO to lead a Community Corrections initiative and to expand GEO's RRC business.

171. Brown possessed the best qualifications, expertise and most experience in the Community Corrections field of all GEO executives.

172. GEO discriminated against Brown on the basis of race to deny him the terms, conditions or privileges of employment to which he was entitled as a GEO executive level Vice President including equal treatment, integration into the corporate structure and culture, a clear chain of command and hierarchy that did not impose upon Brown the requirement to report to non-supervisory employees or lower level employees, a basic job description, and a work-place free of hostility, harassment, ridicule, humiliation or ostracism.

173. GEO discriminated against Brown by treating him differently than other similarly situated employees.

174. GEO's discrimination of Brown was severe, pervasive, and daily and constituted a hostile work environment under New York Human Rights Law.

175. GEO's disparate treatment of Brown on the basis of his race violated the New York Human Rights Law.

176. GEO had more than four (4) employees at all relevant times.

177. Brown was caused to resign, suffer humiliation and mental anguish, emotional distress, caused to lose wages, promotion opportunities, and required to incur expenses to create for himself an employment position at the executive level in the Community Corrections field.

178. Wherefore, Counterclaim-Plaintiff Brown prays for Judgment of this Court ordering Plaintiff/Counterclaim Defendant to pay compensatory damages in an amount to proven at trial.

## COUNT FOUR

## DISCRIMINATION UNDER NEW YORK CITY RIGHTS LAW BY BROWN

179.    Counterclaim-Plaintiff Brown repeats and realleges each and every allegation set forth in paragraphs "1" through "159" as if herein set forth at length.

180.    Brown is a member of a protected race class under the New York City Human Rights Law.

181.    Brown was qualified to hold an executive level Vice President position at GEO.

182.    Brown was the most qualified executive at GEO to run the Brooklyn and Bronx RRCs.

183.    Brown was the most qualified executive at GEO to lead a Community Corrections initiative and to expand GEO's Community Corrections/RRC business.

184.    Brown possessed the best qualifications, expertise and most experience in the Community Corrections field of all GEO executives.

185.    GEO discriminated against Brown on the basis of race to deny him the terms, conditions or privileges of employment to which he was entitled as a GEO executive level Vice President including equal treatment, integration into the corporate structure and culture, a clear chain of command and hierarchy that did not impose upon Brown the requirement to report to non-supervisory employees or lower level employees, a basic job description, a work-place free of hostility, harassment, ridicule, humiliation or ostracism.

186.    GEO discriminated against Brown by refusing to consider him to lead a GEO Community Corrections initiative even though he was the most qualified candidate for the job.

187.    GEO discriminated against Brown by treating him differently than other similarly situated employees and constituted a hostile work environment under New York City Human Rights Law.

188. GEO's disparate treatment of Brown on the basis of his race violated the New York City Human Rights Law.

189. GEO had more than four (4) employees at all relevant times.

190. Brown was caused to resign, suffer humiliation and mental anguish, emotional distress, caused to lose wages, promotion opportunities, and required to incur expenses to create for himself an employment position at the executive level in the Community Corrections field.

191. Wherefore, Counterclaim-Plaintiff Brown prays for Judgment of this Court ordering Plaintiff/Counterclaim Defendant to pay compensatory damages, together with costs and reasonable attorneys fees incurred in this action, and punitive damages, in amounts to be proven at trial.

**WHEREFORE**, Counterclaim-Plaintiffs prays for Judgment from this Honorable Court ordering Plaintiff/Counterclaim-Defendant to pay:

1. For Count One, compensatory and special damages, reasonable attorney's fees, together with costs and expenses incurred in the bid protest, in amounts to be proven at trial, but not less than $6,000,000 plus punitive damages;

2. For Count Two, compensatory and special damages, reasonable attorney's fees, together with costs and expenses incurred in the bid protest, in amounts to be proven at trial, but not less than $6,000,000 plus punitive damages;

3. For Count Three, compensatory damages in an amount to be proven at trial;

4.    For Count Four, compensatory damages, reasonable attorney's fees and

expenses incurred in this action, and punitive damages in amounts to be

proven at trial; and

5.    For such other, further and different relief as this Court may deem just and

proper.

## JURY DEMAND

Counterclaim-Plaintiffs respectfully demand trial by jury.

Date:  Garden City, New York
       February 7, 2012

                                    OHRENSTEIN & BROWN, LLP

                                    By: _____
                                        Michael D. Brown (9856)
                                        Matthew Bryant (2408)
                                    *Attorneys for Defendants and Counter-*
                                    *Claim Plaintiffs Community First*
                                    *Services, Inc., Jack A. Brown,*
                                    *and Josette Nelson-Dabo*
                                    1010 Franklin Avenue, Suite 200
                                    Garden City, New York 11530
                                    (516) 873-6334

TO:    Matthew H. Kirtland, Esq.
       FULBRIGHT & JAWORSKI L.L.P.
       *Attorneys for Plaintiff*
       Market Square
       801 Pennsylvania Avenue, N.W.
       Washington, DC 20004-2623
       (202) 662-4659

       Felice B. Galant, Esq.
       FULBRIGHT & JAWORSKI L.L.P.
       *Attorneys for Plaintiff*
       666 Fifth Avenue, 31st Floor
       New York, NY 10103-3108
       (212) 318-3000

Caroline M. Mew, Esq.
FULBRIGHT & JAWORSKI L.L.P.
Market Square
801 Pennsylvania Avenue, N.W.
Washington, DC 20004-2623

Dennis E. Glazer, Esq.
DAVIS POLK & WARDWELL LLP
*Attorneys for Plaintiff*
450 Lexington Avenue
New York, NY 10069
(212) 450-4900

David C. Pitluck, Esq.
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10069

Gail Adams, Esq.
ADAMS SAMPSON & ASSOCIATES, LLC
*Attorneys for Defendant*
*Aykroyd Lake*
9114 Flatlands Avenue
Brooklyn, New York  11236
(718) 272-8470