1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - -    X

GEO GROUP, INC.,                    :
                                              11-CV-1711(LDH)
          Plaintiff          :

    -against-               :        United States Courthouse
                                     Brooklyn, New York
COMMUNITY FIRST SERVICES,
INC, et al.,                :
                                     March 16, 2016
          Defendants.       :        12:00 o'clock p.m.

- - - - - - - - - - - - -    X

                 TRANSCRIPT OF PRE-MOTION CONFERENCE
             BEFORE THE HONORABLE LASHANN DEARCY HALL
                  UNITED STATES DISTRICT JUDGE.

APPEARANCES:

For the Plaintiff:              DAVIS POLK & WARDWELL LLP
                                450 Lexington Avenue
                                New York, New York   10017

                                BY:  GREG D. ANDRES, ESQ.
                                     ANDREW DITCHFIELD, ESQ.

For the Defendants:             CARTER LEDYARD & MILBURN LLP
                                2 Wall Street
                                New York, NY 10005

                                BY: G. MICHAEL BELLINGER, ESQ.

                                ELLENOFF GROSSMAN & SCHOLE LLP
                                1345 Avenue of the Americas
                                11th floor
                                New York, NY 10105

                                BY: MICHAEL J. SULLIVAN, ESQ.

2

1    APPEARANCES:   (Continued)

2
     Court Reporter:                Charleane M. Heading
3                                   225 Cadman Plaza East
                                    Brooklyn, New York
4                                   (718) 613-2643

5    Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
6

7

8                        *      *      *      *      *

9

10          THE CLERK:  Civil cause for status conference.

11   11-CV-1711.  GEO Group v. Community First Services, Inc., et

12   al.

13          Counsel, please state your names for the record.

14          MR. ANDRES:  Good afternoon, Your Honor.  Greg

15   Andres and Andrew Ditchfield for plaintiffs.

16          THE COURT:  Did you forget your name for a second?

17          MR. ANDRES:  Andres, Andrew, a little similar there.

18          THE COURT:  All right.  Good afternoon.

19          MR. SULLIVAN:  Michael Sullivan on behalf of both

20   Jack Brown, the individual defendant, and CFS, the corporate

21   defendant.

22          THE COURT:  Is Mr. Lake on the line?

23          THE CLERK:  No, Judge.  He was away from his desk.

24          MR. BELLINGER:  And, Your Honor, I'm Mike Bellinger.

25          THE COURT:  I'm so sorry.

3

1          MR. BELLINGER:  I didn't want you to take my head

2     off.

3          THE COURT:  I need to ask plaintiffs does your

4     motion, your anticipated motion relate to claims against

5     Mr. Lake?

6          MR. ANDRES:  It does not.

7          THE COURT:  So I am correct that these proceedings

8     do not implicate Mr. Lake at all?

9          MR. ANDRES:  That's correct, Your Honor.

10         MR. SULLIVAN:  That's correct, Judge.

11         THE COURT:  Okay.  Good.  Please be seated.

12         All right.  This case has been around since 2011?

13         MR. ANDRES:  Yes.

14         THE COURT:  Just please educate me why this case is

15    five years old.  Somebody.  Anybody.

16         MR. ANDRES:  Judge, maybe I can take a shot at it

17    and also just maybe say a word about settlement.

18         THE COURT:  Okay.  I had like to hear that.

19         MR. ANDRES:  One of the reasons the case has been

20    around for that long is because the case was effectively

21    settled for a period of more than a year.  So the parties came

22    to a settlement.

23         THE COURT:  And it fell apart?

24         MR. ANDRES:  By way of background, GEO is a private

25    prison group and Mr. Brown is a former employee.  There's a

4

1  point where the settlement involved a transfer of the contract

2  that Mr. Brown and his company currently operates for the

3  Bureau of Prisons.  The idea was that we would transfer that

4  contract back to GEO and that involved a variety of different

5  issues with the Bureau of Prisons, ultimately, a zoning issue

6  and a real estate issue that precluded us from settling.  So,

7  for a large part of that five years, the case was actually

8  settled.

9          So, with that background, let me just say before we

10  talk about the motions, we have engaged in additional

11  settlement discussions and more recently, we've done that, and

12  I think the parties agree that the next step, we're going to

13  continue to discuss it amongst ourselves, but we think it

14  would be helpful to have Judge Go involved.

15          THE COURT:  Great.

16          MR. ANDRES:  She, by all accounts, is the only party

17  either in this courtroom or this courthouse that has been

18  involved since the beginning since we started with Judge Amon

19  and, frankly, different counsel on both sides at different

20  points.  So, we think it would be helpful to do that, to go

21  back to Judge Go.

22          We're going to continue to speak and both parties

23  are prepared to address the issue of why we think we should be

24  permitted to file summary judgment, but what we're going to

25  ask the Court is to hold off setting a motion schedule until

1  such time as we have the opportunity to talk to Judge Go or

2  meet with her and what we were hoping to do is resolve, to the

3  extent Your Honor is agreeable, resolve the issue of whether

4  or not each party can file their summary judgment motions and

5  hold that in abeyance until May 1st.  That would give us

6  enough time to go and speak to Judge Go.  We would do it

7  sooner.

8          There's a conflict issue and I'll let Mr. Sullivan

9  talk about that in terms of the insurance carrier who also

10  needs to be involved.

11          So the idea would be as of May 1st, if we haven't

12  settled the case then, and we can do that today, agree to,

13  provided Your Honor agrees that we can file our motions, would

14  then just set a motion schedule to take place in the beginning

15  of early May.  So we think there's some value to continue to

16  talk about settlement, in large part, because the case was

17  settled at one point.

18          THE COURT:  What is the conflict issue?

19          MR. SULLIVAN:  Judge, I'm Mike Sullivan.

20          The issue is that the primary person at the

21  insurance carrier who needs to be involved is out of

22  commission until I think it's March 30th or maybe it's

23  April 3rd is their first day back.  I don't know the exact

24  circumstances.  I don't know but I think it's something on a

25  personal level.  Once he comes back, he needs a little bit of

6

1    time to complete and put into place what needs to be put into

2    place.

3             Mr. Bellinger just pointed out that he and I are new

4    to the case in terms of we came in in 2015, but I think

5    there's a new wind blowing between the parties in terms of

6    settlement and I am very confident that if we go down this

7    road, that there is a very high likelihood that we're going to

8    have the case settled in the time frames that we are talking

9    about and I would support the proposition that we move along

10   that line.

11            THE COURT:  What about the external impediments?  I

12   mean, it sounds like the parties have at least for a long time

13   been amenable to settlement but there have been external

14   impediments.

15            Are the external impediments now, have they now been

16   removed such that the Court doesn't need to be concerned with

17   that?  Because I really have no interest in this being

18   Groundhog Day.

19            MR. SULLIVAN:  Yes.

20            Go ahead.

21            MR. ANDRES:  And just to be fair, Mr. Sullivan and

22   Mr. Bellinger effectively came in when the settlement went

23   south, but effectively the terms now would be substantially

24   different, in large part, because the contract at issue, a

25   year has gone by so it really doesn't make as much sense for

7

1  the GEO company to seek that contract or to get it back from

2  Mr. Brown.

3          So, since we've had that impediment with the real

4  estate issue, we've talked on a settlement basis which

5  wouldn't include the same issues that were involved in the

6  original settlement.  So we've obviously all moved on from

7  that.  Now we're talking about monetary issues and I think the

8  terms would just be different so that it wouldn't be Groundhog

9  Day.  But, again, the backstop being that as of May 1st, we

10 basically have six weeks, but if not, provided the Court is

11 amenable, we'll file motions or we'll -- I'm sorry, as of May

12 1st, two weeks after May 1st, if we haven't come to a

13 settlement, we'll start with the motion schedule.

14         MR. SULLIVAN:  It won't be Groundhog Day because

15 we're not at all dealing with a settlement that involves a

16 business plan.  So this is a strictly cash deal if it's going

17 to happen which is very simple.

18         THE COURT:  Yes, that's right.

19         In my short tenure on the bench, I have been loathe

20 to grant extensions with regard to dispositive motions because

21 it's my preference that I keep cases moving along

22 aggressively, however, I am persuaded by the arguments that

23 counsel have made and largely because there was a settlement

24 already and so I don't, I don't feel as if this is a situation

25 where the parties are, it's just aspirational that there could

8

1  be a settlement.  So I think that there's at least some

2  evidence that the parties really want to resolve this.

3            So, with that, because I typically set a briefing

4  schedule at the pre-motion conference, which I think as the

5  order indicated would require opening submissions to be served

6  two weeks after the conference, we will use May 1st as the

7  operative date as if it were the date of the pre-motion

8  conference and to the extent that there is no settlement as of

9  May 1st, I guess that's May 14th or May 15th --

10            MR. ANDRES:  May 15th, I believe, is a Sunday,

11  Judge.  May 16th is the first Monday and then the return date

12  four weeks later would be June 13th and then the response on

13  June 27th.

14            THE COURT:  Thank you.

15            MR. SULLIVAN:  And May 16th is my birthday, Judge.

16  I'm sure that's relevant.

17            THE COURT:  Yes, it is.  You will want a birthday

18  gift of not having to file submissions.  That's what you want.

19            MR. SULLIVAN:  That's what I want.

20            THE COURT:  Okay.  So with that behind us, we should

21  probably jump in.  There's significant or there is at least

22  certainly enough to jump in.

23            I want to start with the pre-motion conference

24  letter by Mr. Sullivan.  I was looking for the date of it but

25  I am missing it somehow.  So I would like to start with you

1  and your proposed motion seems to be first premised on the

2  notion that the claims at issue related to the Brooklyn

3  contract should be dismissed based on doctrines of collateral

4  estoppel and claim preclusion.  Correct?

5          MR. SULLIVAN:  Correct.

6          THE COURT:  I will hear you first on that and then

7  we will move on.

8          MR. SULLIVAN:  Thank you, Judge.

9          The concept here is twofold.  One is that GEO has

10  already gone to forum after forum after forum and lost in

11  those forums and it would be our argument that at this point,

12  there should be a preclusion or a waiver on their continuing

13  to make the same arguments in the different forums, but this

14  case has a unique twist, Judge, and that is when they got to

15  the final forum before this forum, they withdrew the action,

16  and I would suggest there is not a lot of case law that deals

17  with something unusual like that.

18          I would suggest to the Court that this court should

19  consider dismissing those claims because by withdrawing in the

20  final forum at the time that Mr. Brown and CFS were arguing

21  that they should continue to a final adjudication on the

22  merits and that GEO said, no, we've come this far and now

23  we're going to pull the plug on it and start in a whole

24  another forum so now you have to defend yourselves in the

25  U.S. District Court instead of where we were in the Court of

10

1   Claims, I would suggest that that is, as I said in the brief,

2   it's a gaming of the system that the Court should not

3   countenance.  We have the prior decision which was on, not on

4   the merits, obviously, it was on the pleadings, but there is a

5   great deal in Judge Ross's decision that goes to this issue.

6          Let's say GEO lost in one of those fora, that GEO

7   lost before the BOP.  I would agree that, I would agree with

8   counsel that something along those lines would not necessarily

9   give preclusive effect, but we have a very unusual

10  circumstance with regard to the way things were handled by GEO

11  and it's our position that the Court could at this stage in a

12  summary judgment motion draw the reasonable inference, as

13  Judge Ross looked at but didn't have to get to at that stage,

14  but draw the reasonable inference that what really was going

15  on here was intentional anti-competitive behavior on a, by a

16  multi million, if not billion dollar corporation against a

17  small New York community-based institution that was trying,

18  trying to survive and do what it does.

19          THE COURT:  Okay.  I want to take this step by step

20  if we could.

21          So, yes, Judge Ross does devote a considerable

22  amount of attention to, in her opinion, to the sham litigation

23  exception and certainly, you know, she believed that there was

24  evidence that at least could support, on a motion for judgment

25  on the pleadings, the notion that litigation before the GAO

1   and the subsequent court proceedings were sham proceedings,

2   but I don't believe and I don't read her opinion to speak to

3   the preclusive nature that those proceedings have here.

4           So, one, with respect to claim preclusion, isn't it

5   the case that what I need in order to invoke the doctrine of

6   claim preclusion, I need to have the same claims to have been

7   litigated?  I don't see where these claims were previously

8   litigated in any of the prior proceedings, and even before the

9   administrative agency or before a court of competent

10  jurisdiction.  I don't see how we have the same claims at

11  issue such that I can invoke the doctrine of claim preclusion.

12          MR. SULLIVAN:  Judge, I would point the Court as a

13  starting point to the report of the BOP.  It's actually a

14  brief written by the BOP.  In fact, Your Honor got it recently

15  from my office.  There would be no reason you would have

16  gotten to it yet.

17          THE COURT:  But I have.

18          MR. SULLIVAN:  Oh, you have?  Okay.  Excellent.

19          In that document, the BOP in defending its decision

20  to say that there was nothing wrong with the bidding process

21  in front of the GAO, and that was eventually sustained, the

22  BOP goes through exactly the claims about whether or not

23  Ms. Meister who was a GEO employee gave or shared with Jack

24  Brown pricing information and whether or not Jack Brown used

25  that pricing information.

1          THE COURT:  I'm sorry.  I want to cut you off.

2          I don't want us to conflate issue preclusion with

3     claim preclusion.  Right?  We are going to get to issue

4     preclusion and whether or not there is an identity of issues

5     and, therefore, whether there's a preclusive effect but, and

6     what you've identified are issues in my mind, not the claims.

7     And at least when I read it, I think that GEO points out that

8     there was express language disclaiming that any of, the

9     administrative agency was taking on any of these private

10    disputes.

11         So not only do I not see evidence that the claims

12    were the same, what I see is evidence, a disclaimer that these

13    private disputes were resolved through these proceedings.

14         MR. SULLIVAN:  And I would concede to the Court that

15    there is language in, throughout that entire trail saying

16    we're not resolving the private parties' dispute here and I

17    would agree with Your Honor that if one were to take the claim

18    and claim and compare them, they are slightly different in

19    terms of what the allegations are.  One allegation is

20    essentially the Bureau of Prisons made a mistake in terms of

21    how it handled it and the claim here is that Mr. Brown and CFS

22    violated various duties they had.

23         So, I would concede to the Court that on a claim by

24    claim, technical preclusion basis, that perhaps I would have

25    to concede that claim preclusion is the wrong way to address

13

1   it.

2        THE COURT:  So let's put claim preclusion over here

3   and let's assume claim preclusion does not apply.  So that

4   leaves us with issue preclusion.

5        MR. SULLIVAN:  Okay.

6        THE COURT:  All right.  Go ahead.

7        MR. SULLIVAN:  With regard to issue preclusion, I

8   don't think I need to restate what I just stated but when one

9   goes through those decisions, it is absolutely at the

10  forefront with regard to whether or not information was

11  improperly taken, whether or not that information was

12  improperly used by Mr. Brown and whether or not Mr. Brown and

13  CFS got an improper advantage in using the information.

14       There's language in the -- again, it's a very

15  fulsome opinion or brief so it's very helpful as a starting

16  point in the BOP brief.  They talk about whether Ms. Meister

17  gave the information, whether that information was so stale

18  that it would have been useless to Mr. Brown, the fact that

19  the information, even if it was given, was information about a

20  pricing model that became irrelevant by the end of the process

21  because GEO was constantly changing its bid and Mr. Brown was

22  constantly changing his bid and specifically points out that

23  Mr. Brown had been the person running the facility in

24  Brooklyn.  So, essentially, of course he would know what the

25  staffing was and he would know all of the information that one

14

1    would need to make a bid and, therefore, it was not in any way

2    a reasonable inference that was promoted by GEO that there had

3    been improper stealing of information and using of

4    information.

5            Those are exactly the issues that we're dealing with

6    here, Judge.  They're not similar.  They're exactly the same

7    issue.

8            THE COURT:  Right.

9            Didn't Judge Amon already address whether she was

10   willing to give preclusive effect to the findings made by the

11   Borough of Prisons which the findings I think you have recited

12   here?  And she said then, and I think that it is the case

13   still, that you have offered no authority to say that the

14   Court should offer preclusive effect to those factual findings

15   from the Bureau of Prisons.

16           Then if you extend that further with regard to the

17   GAO, there is certainly case law that suggests that the

18   administrative decisions of the GAO should not be afforded

19   preclusive effect.  So if I can't either because the Bureau of

20   Prisons findings -- certainly, I do not have anything to

21   suggest that a Bureau of Prisons finding should be given

22   preclusive effect, but then I then with respect to the GAO

23   have some authority that would suggest that it would be

24   improper for me to give preclusive effect to the findings of

25   the GAO.

1          MR. SULLIVAN:  I would agree with the Court on that

2     but, again, we have a situation here where it's all of those

3     circumstances plus, plus the fact that GEO then went to

4     another forum and withdrew their claims.

5          THE COURT:  The malicious prosecution aspect of it

6     and the kind of serial filing of administrative proceedings

7     and the findings of the Bureau of Prisons with respect to that

8     claim, the finding of the GAO with respect to that claim, I

9     think that that certainly provides the Court with evidence

10    that it must consider for the purposes of determining whether

11    or not there is a malicious prosecution claim can or cannot be

12    sustained as a matter of law, but we're talking about now not

13    whether those proceedings are used to support a malicious

14    prosecution claim, but whether the finding of those

15    proceedings should be given preclusive effect such that they

16    bar the plaintiff from pursuing its other claims or its claims

17    against the defendants.

18          I'm not seeing evidence that the law supports the

19    notion that preclusive effect should be given to the Bureau of

20    Prisons or the GAO.

21          MR. SULLIVAN:  I understand exactly what the Court

22    has asked me.

23          Put aside our affirmative claim with regard to

24    malicious prosecution, put that totally aside, only the

25    question of whether or not the case should be dismissed or

1   that portion of the case.  I would suggest to the Court and we

2   would argue in our motion that the same line of activity

3   leading to a withdrawal should preclude the plaintiff from

4   being able to now go into a new forum and, therefore, the

5   Court, with its equitable powers, can say you can't keep doing

6   this, we're not going to allow your claim to go forward.

7            Put aside whether Mr. Sullivan is ever going to get

8   a dollar on his affirmative claim.  I'm not even talking about

9   that now.  I am talking about our argument to this Court and I

10  cannot give you a citation where a court has done this because

11  it's a very unusual set of facts and circumstances.

12           I would argue to this court that although none of

13  the particular decisions anywhere along the line would

14  individually have preclusive effect that would require a

15  dismissal, I'm not conceding that, but let's assume for the

16  sake of argument that that's correct.  I would argue that,

17  collectively, when you put them all together and then you have

18  a final forum where finally these issues were potentially

19  going to be decided by a court and then there's a withdrawal

20  and a re-filing elsewhere, I would suggest to the Court that

21  Your Honor would have the power to dismiss those claims as a

22  matter of -- I don't, Your Honor, I don't --

23           THE COURT:  But that's the problem.  You can't

24  finish that sentence.  As a matter of?

25           MR. SULLIVAN:  I don't know what to call it.  As a

1    matter of fairness and justice.

2           THE COURT:  But there is no doctrine that supports

3    that, right?  There is no doctrine that says that because he,

4    the plaintiff here -- sorry, it's an "it" -- proceeded with

5    these administrative proceedings unsuccessfully, that I

6    should, without considering the merits of the claims, just say

7    you don't succeed here.  Based on what?  I don't have issue

8    preclusion.  I don't have claim preclusion.  I just say you

9    shouldn't be here.  There's no doctrine that applies.

10          Now, certainly, there is a claim that you all have

11   brought for malicious prosecution which, in fact, does capture

12   the conduct that you complain of with respect to kind of

13   pursuing these proceedings and whether it be an administrative

14   agency or a court, it seems that that conduct is captured by

15   your malicious prosecution claim and if the case were to

16   proceed, the jury would then be able to make a finding with

17   respect to whether there is evidence to support the other

18   claims.

19          MR. SULLIVAN:  Your Honor, I would suggest this.

20   Let's assume that that stream of activity was in some manner

21   wrongful.  Maybe it falls into the box of malicious

22   prosecution, but I would suggest that it also falls within the

23   box of you can't do that and the Court should have the power

24   to say even if it -- let's assume in the elements of malicious

25   prosecution, the jury finds just not enough to show that it

1  was at a high level of intentionality to give damages.

2       I would suggest that you might have a slightly lower

3  standard for the Court to say I see gaming of the system here

4  such that I'm not going to allow the plaintiff to have the

5  benefit of using the system to now recover millions of dollars

6  against the defendants, even though the jury maybe didn't get

7  to the level of giving the defendants damages on that basis,

8  but there would be enough for the Court and perhaps it's a new

9  doctrine, Your Honor.

10       THE COURT:  It is.  And I was confirmed about four

11  months ago and when I attended my hearings, they asked me

12  questions about my willingness to create new law and I told

13  them I wouldn't do it.  Right?  My job is to interpret the law

14  that exists.  I don't have the ability to make new law and you

15  have not provided me with a legal doctrine that would allow me

16  to do what it is that you are asking me to do.

17       MR. SULLIVAN:  Okay.  Well, first of all, you have

18  been appointed now so you --

19       THE COURT:  So I can go rogue?  Isn't that a high

20  crime of misdemeanor?

21       MR. SULLIVAN:  You don't have to worry about

22  answering questions like that.  But, no, I would suggest to

23  the Court that I believe -- look, this was a three-page

24  letter.  I believe that we're going to be able to put together

25  an argument for Your Honor that will fit it within the

1   doctrines of --

2        THE COURT:  I think you are going to put together an

3   argument and I think it is highly unlikely that you are going

4   to be able to provide me with an argument that makes your

5   argument fit within the doctrine of issue preclusion or claim

6   preclusion.  Claim preclusion, certainly not.  Issue

7   preclusion, I do not see how you are going to be able to do

8   that.  It does not seem consistent with any of the law on this

9   point and this isn't a situation where you are going to be

10  able to supply me with additional evidence that came out in

11  discovery or something.

12       At the end of the day, the doctrine is what the

13  doctrine is.  You don't have any authority that's going to

14  allow me to give preclusive effect to the Bureau of Prison's

15  decision.  I think if you could have, you would have before

16  Judge Amon.  I don't think you are going to be able to provide

17  any authority that is contrary to the cases that have been

18  cited by GEO with respect to determinations made by the GAO

19  and then I think, we haven't gotten to it, but that you are

20  going to have some issues with respect to the identity of

21  issues and the decision in or the determinations made by the

22  Court of Federal Claims.

23       I say this to you because if this case proceeds, I

24  would like for us to make sure that we are expending our

25  resources wisely because to the extent that you are making an

1  argument that you know does not fit at all with the law, then

2  you are just asking the Court to kind of spin its wheels and

3  you are spinning your wheels as well.  I cannot stop you from

4  making the motion but we have looked through it.  I looked

5  through it.  I spent a lot of time reading the decisions to

6  try and see if I could find the identity of issues that was

7  necessary, to see if I can find a basis for the Board of

8  Prison's opinion to have some type of preclusive effect.  I

9  haven't found it and I think that the absence of any -- I

10  realize it's only a three-page letter, but I think the absence

11  of any law on this suggests to me that it is very likely that

12  you don't have any authority.  If you have it, certainly you

13  will cite it to me, but have some.  Don't ask the Court to

14  make new law, please.

15          MR. SULLIVAN:  I thought it was going pretty well.

16          No, Judge, here's my suggestion on this.  I would

17  never file anything that I thought was wasting my time or the

18  Court's time.  I would suggest that we have a good faith basis

19  for believing that there should be a doctrine that covers

20  this.

21          THE COURT:  You understand why I chuckle, that there

22  should be a doctrine, a good faith basis to believe that there

23  should be a doctrine, not a good faith basis to believe that

24  there is a doctrine to cover this.

25          MR. SULLIVAN:  Understood.  I'll tell you what.  I

1    will take what Your Honor has said very carefully before we

2    file such a motion, but if we do file it, I would say that

3    we're doing it only because we believe that it should be the

4    case and I would go back to the idea that although there are

5    affirmative claims that would be cognizable if this was a

6    wrongful series of events, I think there should be defensive

7    claims as well.

8               THE COURT:  Right.  Okay.  I don't really --

9               MR. ANDRES:  I don't really need to say anything,

10   Judge.  Thank you.

11              THE COURT:  Okay.

12              Mr. Sullivan, you are not done.  So let's talk

13   about, you have an argument in your letter that talks to or

14   speaks to the notion that GEO has no facts to show that the

15   per diem pricing information was used by CFS or Brown to their

16   advantage.

17              I have not been on this case long, certainly not as

18   long as Judge Ross, but is the scope of Geo's claims limited

19   to the per diem pricing information with regard to the unfair

20   competition appropriation?  Because as I read the complaint,

21   the per diem pricing information was one of, I think, three or

22   four categories of information that was said to have been

23   unfairly used or misappropriated.

24              I say this because what you are asking the Court is

25   for me to make a finding as a matter of law.  Obviously, I

1  cannot resolve any issues, but if there is an issue of fact, I

2  am constrained and I am unable to grant a motion for summary

3  judgment.

4         So even if I assume that you are correct, and I

5  suspect that GEO may take an issue with this, that it is

6  undisputed that there is no evidence or facts to show that the

7  per diem pricing information was used, what do I do with the

8  other categories of information that I believe provide the

9  foundation for the unfair competition and misappropriation

10  claims?

11         MR. SULLIVAN:  Judge, I would suggest that at the

12  time that the complaint was drafted and filed, it was a very

13  different circumstance than where we are now having done all

14  the discovery and in a nutshell, Your Honor, what you would,

15  what you'll see in the papers, I'm assuming, is the following.

16         There is an individual named Carol Kichen.

17         THE COURT:  Yes.

18         MR. SULLIVAN:  Carol Kichen is a big writer.

19         THE COURT:  She was the third-party person who wrote

20  the bid on behalf of CFS and Brown, correct?

21         MR. SULLIVAN:  Correct.  And she wrote the bid for

22  CFC which was the --

23         THE COURT:  Predecessor.

24         MR. SULLIVAN:  -- predecessor company where

25  Mr. Brown was working which was bought by GEO.

1      So, what the discovery has shown is that all of

2  those bids look alike.  It's sort of, like, a plea agreement.

3  Ninety percent of it is boilerplate and there's the little

4  part that applies in the particular case.  All of the

5  discovery has shown only that these bids look alike because

6  all bids look alike and GEO claims that Ms. Meister turned

7  over this specific pricing information.  There's a factual

8  dispute about that.  There's no question Mr. Brown says, no,

9  she didn't, and Ms. Meister testified, yes, I did.  The only

10  thing that she talks about, talked about turning over was this

11  per diem pricing information that was going to go in the bid.

12      When you see these bids, Judge, they're, you know,

13  it's 30 pages long and it has all kinds of information with

14  regard to staffing and all of that is information that the

15  evidence -- it's undisputed that Mr. Brown ran the facility.

16  He knew what the staffing was.  He knew how many people worked

17  there.  He knew who worked in what.  It was not an enormous

18  facility.  I think it's 150 beds.  It's not a 10,000 person

19  prison.

20      So, the evidence will be undisputed, I would

21  suggest, that everything else essentially in that bid is

22  information that either Mr. Brown could get publicly or he

23  knew himself.  The only pricing information that he wasn't

24  privy to was this per diem pricing information that they say

25  was turned over and it's our position, for essentially the

1   same reasons that was in the BOP brief, it's our position that

2   there's nothing in the record that supports the notion and, in

3   fact, everything in the record is undisputed that he wasn't

4   able to use the pricing information in any kind of useful way.

5   In fact, I think the BOP -- and I'm not talking about

6   preclusive effect.  I'm just talking about explaining effects.

7            The BOP says if Mr. Brown had wanted to undermine

8   GEO's bid, he would have done it by a few dollars per day and

9   taken advantage of as much money as he could have gotten out

10  of it and the fact of the matter was that BOP's bid was

11  16 percent higher than Mr. Brown's bid.

12           So, I believe that the categories of information and

13  material that are in the complaint are not going to be

14  sustained as having any factual basis for being useful

15  information that was somehow something that Mr. Brown got and

16  prated on when he filed his own bid.  Will there be

17  information that Carol Kichen, who put the bid together, was

18  perhaps, one could infer, that she was operating with the old

19  copy of the five year old bid?  Perhaps, but there's no,

20  there's no facts and nobody has suggested any facts that show

21  that that was any advantage to the bidding process.

22           So, the only thing we're talking about, at the end

23  of the day, when you look at all the discovery, is this issue

24  of the pricing information for the per diem and I would

25  suggest that Your Honor could make a decision on undisputed

1  facts that there's no evidence that it was used.  The burden

2  of proof is on the plaintiff obviously.  They get the benefit

3  of the doubt in a motion like this, but they've got to come

4  forward with something that shows that there was actual

5  improper use and harm and none of the facts support that.

6            MR. ANDRES:  Judge, just briefly, we dispute all

7  those facts.

8            So, the contract was won by Mr. Brown because his

9  price was lower.  He knew GEO's price.  It's a central issue

10 here.  He knew not only the price, and the record about it is,

11 there are any number of different factual disputes with

12 respect to that, but in addition to price, there's staffing,

13 there are other issues.  Mr. Sullivan said Mr. Brown knew all

14 that.  He knew all that because he was working for GEO during

15 the time.  He had access to all of GEO's confidential

16 information.  He was responsible for helping GEO submit its

17 own bid to, to the BOP.

18            Now, mind you, there are two contracts, right?

19 We're talking, first, there's the Bronx contract.

20            THE COURT:  There's a 2006 contract and the 2009

21 contract?

22            MR. ANDRES:  Correct.

23            Mr. Brown has admitted in his deposition that in

24 2006, while employed by GEO, he submitted an application to

25 compete with GEO for that very facility in the Bronx.  The BOP

1   ultimately questioned his ability to pursue that application

2   and he withdrew it.  He did the exact same thing in 2009, mind

3   you, with one exception.

4          THE COURT:  But I just want to be clear.  Your

5   unfair competition claim is not based on conduct related to

6   the 2006 contract, right?  It is related to the alleged

7   conduct in regard to the 2009 contract, yes?

8          MR. ANDRES:  I think it's with respect to both.

9          THE COURT:  Is it?

10         MR. ANDRES:  I'm sorry.  Count One is just with

11  respect to Brooklyn.  I'm sorry, Judge, you're right, just the

12  2009.

13         THE COURT:  All right.

14         MR. ANDRES:  But in any case, he was aware of the

15  pricing information which is a crucial fact and there are

16  other issues aside from just the pricing, whether it's

17  staffing, whether it's design, it's a whole host of issues

18  that he had access to.

19         With respect to Ms. Kichen, she wasn't an expert or

20  doesn't purport to be an expert.  Anything that she was

21  writing -- and, yes, she absolutely worked for CFC.  Anything

22  she was writing in that bid application came from Mr. Brown

23  and she testified to as much.  So she's getting her

24  information.  She's effectively working as, not as a prison

25  expert, as somebody who is effectively the scribe who's

1   writing the applications.  She's getting the information from

2   Mr. Brown and then putting the information in the bid.

3            THE COURT:  Right.  This question of use and, you

4   know, the theme of whether this information was used comes up

5   and is an issue in both of the proposed motions for summary

6   judgment and both of you all are telling me that there is not

7   going to be an issue of fact on that for different reasons,

8   but doesn't that in and of itself suggest that there is an

9   issue of fact on that?

10           MR. ANDRES:  Well, I would say something slightly

11  different, Judge, which is we don't think that the issue of

12  price, which is what Mr. Brown is talking about, precludes us

13  from seeking summary judgment because of the other categories

14  which you've mentioned.

15           So, we could rely on those categories outside of

16  price which I think there would be no dispute of fact and we

17  could seek summary judgment on that ground that other than

18  price, there were other factors that Mr. Brown gained unfairly

19  from GEO and that those facts are not disputed.

20           THE COURT:  And it's not disputed that he used those

21  other categories of information in connection with the

22  preparation of the bid proposal?

23           MR. ANDRES:  Well, I'll let Mr. Sullivan speak to

24  that, but there's no question that he had access to that

25  information and that it would have been relevant for his

1   application for the contract.

2          THE COURT:  And I know I'm skipping ahead a little

3   bit, but in order for me to grant you summary judgment on the

4   unfair competition claim and, indeed, on the misappropriation

5   of confidential information claim, and we could go through the

6   others because I think it does implicate the others, some

7   others as well, I would have to find use, correct?

8          I mean, in order to sustain the claim, I would have

9   to find that there was use of this information in the

10  proposal?

11         MR. ANDRES:  Yes, that's correct.

12         THE COURT:  Okay.

13         MR. SULLIVAN:  And, Judge, I think I did 20

14  depositions in this case.  There is no evidence of use and

15  perhaps counsel could address that.  It's not my position to

16  ask him in this setting, but I think if Your Honor were to

17  question him, I don't think there's any evidence of use

18  anywhere in the case.

19         THE COURT:  I mean, in order for you to be

20  successful on your motion for summary judgment on those

21  claims, obviously, you would have to be able to proffer some

22  information that would suggest to me that there is no question

23  with regard to the use element of those claims and I am

24  supposing that if you intend to bring such a motion before the

25  Court, you are doing so because you expect to proffer such

1    evidence.

2              MR. ANDRES:  Understood, Judge, yes.

3              THE COURT:  Okay.

4              Mr. Sullivan, it appears to me that my concerns with

5    regard to the scope of the information at issue, at least that

6    there seems to be some disconnect.  GEO contends that the

7    information, you say it is limited to just the per diem

8    pricing information.

9              It seems to me that GEO is contending that there is

10   other information beyond just the pricing information that is

11   consistent with the complaint.  You are saying that that was

12   narrowed by the discovery.  It will have to be borne out in

13   the moving papers, but I caution both of you that the Court

14   will not endeavor to resolve issues.  I can't do that here.

15             It seems to me that there certainly are disputed

16   issues with regard to the use of information unfairly, that

17   is, Geo's proprietary information that may have been

18   misappropriated by or alleged to have been misappropriated by

19   CFS and Brown.  So, for the purposes of a motion for summary

20   judgment, as I am looking at this, I am seeing some difficulty

21   in how it is that either party expects me to be able to

22   resolve that issue at this juncture.

23             I am going to put a pin in the malicious prosecution

24   argument for a moment and I am going to move, if I can, to

25   GEO's proposed motion for summary judgment on its claims so

1    that at least the discussion is consistent.

2          So, I want to be clear.  With regard to GEO's

3    affirmative claims against CFS and Mr. Brown, which claims

4    specifically would be subject to the motion for summary

5    judgment?  It is a little unclear to me.  I exempted I think

6    the last five claims believing that, and I think we cleared

7    that up in the beginning, that those implicate Mr. Lake and

8    those would not be the subject of any motion.

9          Correct?

10         MR. ANDRES:  Judge, we would be moving for summary

11   judgment on all the claims absent the ones that implicate

12   Mr. Lake.  They are in many respects related.  They are all

13   some form of business tort.

14         The facts I believe are largely undisputed or at

15   least the relevant facts are, as Your Honor has said.

16   Mr. Brown previously worked for CSC.  He later came to work

17   for GEO.  During the time that he was at GEO, he bid for the

18   Bronx contract.  He's admitted that that was a violation of

19   GEO's, that it was conflict of interest and a violation of

20   his, of the code of conduct.  So, in terms of, for example,

21   Count Four which relates to breach of fiduciary duty, we

22   believe that the facts with respect to those are undisputed.

23         Mr. Brown also made both false statements to GEO

24   about what other competition was available and took certain

25   action to undermine the reputation and integrity of GEO with

1   local political figures which was a relevant fact.

2          So, again, for the purposes of fraud and the

3   misrepresentation, based on his admissions in his deposition

4   that he was engaged in this conduct, we think we can prevail

5   on those issues as well.

6          THE COURT:  I think that the breach of fiduciary

7   duty claim, for example, I don't think suffers from the same

8   concerns that I have regarding what seems to be a very obvious

9   dispute of fact, this use issue, which I think implicates

10  Counts One, Two and Three as I see the question of use being

11  an issue that must be resolved that I think is going to be

12  disputed.

13         Look closely at the claims and please refrain from

14  bringing it if we're just going to trot out the allegations,

15  but at the end of the day it becomes apparent that there's

16  going to be a genuine issue of fact here because, again, we're

17  just doing this unnecessarily.

18         MR. ANDRES:  Understood, Judge.

19         Just as well with respect to Mr. Brown's

20  discrimination claims, Mr. Brown is not able to show any

21  adverse --

22         THE COURT:  We're going to get to those.

23         MR. ANDRES:  Okay.

24         THE COURT:  With respect to the diversion of

25  corporate opportunity claim, in order for me to grant a motion

1   for summary judgment on corporate opportunity claim, I would

2   need to be able to make the finding that the opportunity

3   should be deemed an asset of the corporation.

4           If I read your letter correctly, you are suggesting

5   that it is going to be your expert's testimony that's going to

6   allow me to make the determination that, in fact, this was an

7   asset of the company as a matter of law.

8           MR. ANDRES:  Just one second, Judge.

9           (Pause.)

10          MR. ANDRES:  Judge, the reason that we're asserting

11  that claim is effectively, had Mr. Brown not been, during the

12  time that he was an employee, working to bid on that contract,

13  it would have been an asset of GEO as a matter of law because

14  they would have been the only bidder that was actually

15  applying for the contract.  There was no other competition.

16  And absent Mr. Brown's misconduct in terms of developing his

17  application and submitting it, absent that, we would argue

18  that that was, in fact, a corporate asset of GEO's.

19          THE COURT:  Was there any third party discovery on

20  this point?  I mean, it's the Bureau of Prisons who makes the

21  order.  I'm just curious whether or not there is any evidence

22  on the record outside of your expert opining that they

23  believed that you would ultimately have gotten it saying, yes,

24  if they weren't in it, we would have given it to --

25          MR. ANDRES:  Judge, just so I'm accurate, as I sit

1   here, I can't remember what the record says specifically.  I

2   don't think that either of the parties dispute that these were

3   the only two parties and we may have learned that in the

4   context of negotiations with the Bureau of Prisons in the

5   litigation.

6           So, I believe that I understood that during --

7   after GEO didn't get the contract, there was a meeting with

8   the Bureau of Prisons.  I think it was made clear to us at

9   that point that we were the only other bidder but in either

10  case, we understand that that's a fact we would have to prove

11  and certainly would be in a position to do that.

12          MR. SULLIVAN:  Judge, can I answer that?  The direct

13  answer to your question is there wasn't no third party

14  discovery.  I wasn't in the case at the time, but I believe

15  that the Bureau of Prisons refused.  I think there was perhaps

16  even a motion saying that they couldn't be deposed on the

17  issue.  Mr. Ditchfield is furrowing his brow, so I don't know.

18          I don't think the BOP ever weighed in on that

19  question.  We have an expert who says the opposite.  We have

20  an expert who says if it had gotten down to one bidder, the

21  normal procedure is the BOP would have gone back and done

22  another request for bids or they would have handled the

23  situation quite differently.  So it's absolutely not certain

24  and there would be a huge dispute about whether or not GEO

25  would have gotten the contract absent Mr. Brown's

1   participation.

2        MR. ANDRES:  I don't want to talk past each other.

3   My point was simply that, I think, as a factual matter, there

4   was not another bidder aside from just CFS and GEO.  Whether

5   there would have been another, I wasn't addressing that issue.

6   I wanted to be clear.

7        THE COURT:  No, no, no, that's fine, but

8   Mr. Sullivan's point goes to my point which is you are going

9   to have to make a showing to me that it was an asset of the

10  corporation and that if CFS and Brown weren't in the picture,

11  it would have been yours and at least to me, as I read it, I

12  said given the fact that what we are talking about here is

13  RFPs or, you know, bids to the government, it is hard for me

14  to fathom how -- it's not, you know, the typical context of a

15  corporate asset that you typically find.  This is a case where

16  you were trying to get, you were the incumbent, but you were

17  trying to get this new business.

18       MR. ANDRES:  Judge, we take your point.  I don't

19  want to waste your time.  I think we're relying on the case

20  law that talks about tangible expectancy and that there is

21  case law with respect to that that suggests that that's enough

22  to argue that it's an asset of the corporation, but we'll

23  certainly take the Court's guidance on those issues.

24       MR. SULLIVAN:  And, Judge, just to finish this line,

25  our expert has opined and testified and written a report that

1   says if the BOP is down to one bidder, then they go into a

2   whole process of requiring that bidder to prove what their

3   level is in terms of profit and how they came up with the bid

4   number.  So the basic idea is if it's competitive because

5   there are at least two bidders, then they take the best price

6   and make sure that everybody can do the job.  If it's not

7   competitive, it's a totally different process and the evidence

8   here shows that GEO was taking a 35 to 40 percent profit which

9   probably would never have gotten past the BOP, but that's

10  certainly not something the Court can resolve on a summary

11  judgment motion.

12          THE COURT:  With respect to the cross claim,

13  Mr. Andres, in terms of the reliance aspect, at least as I

14  read the allegations as they were presented in your complaint

15  versus the way in which it has been cast in your letter with

16  respect to the fraud and the misrepresentations and the

17  reliance, in your letter at page three, you say, GEO

18  justifiably relied on these misrepresentations and omissions

19  to its detriment by hiring and continuing to employ Mr. Brown

20  as vice president of community corrections.

21          So, for purposes of your fraud claims and the

22  reliance, is this limited to the fact that you relied on his

23  misrepresentations or omissions so that you kept hiring him as

24  opposed to the way it is cast in your complaint?

25          You say that you relied on him and, therefore, there

1   was use of your material in connection with the bid.  The two

2   are very different and certainly, you know, one implicates the

3   use question that keeps coming up and one does not implicate

4   the use question in terms of the motion for summary judgment

5   and me trying to determine, I think, whether it's really

6   susceptible or ripe for a motion, resolution for a motion on

7   summary judgment.

8          MR. ANDRES:  So, Judge, what we're relying on in the

9   fraud claim are representations that Mr. Brown made in terms

10  of his omission with respect to the Bronx contract, that he

11  didn't tell the company that he had competing businesses, that

12  he didn't tell the company which, again, is a fact, that he's

13  admitted and has admitted competing with GEO in 2006.

14         With respect to Brooklyn, there were false

15  statements about -- he was asked specifically whether there

16  were other competitors.  He also during the time was himself

17  seeking community support from local politicians and local

18  community leaders at a time that he was required to do that

19  for GEO and failed to do so.  So, the argument does not

20  necessarily rely on the use information but, rather,

21  Mr. Brown's statements with respect to competition and with

22  respect to what he said he was doing and not doing vis-a-vis

23  his responsibility for those contracts.

24         THE COURT:  And you relied on those representations

25  for what?

1        MR. ANDRES:  Relied on those representations, for

2   example, we were told that there were not any other

3   competitors for the, for the Brooklyn facility, for example,

4   so we relied on that in putting together our material,

5   deciding what to propose as part of the RFP, to decide whether

6   or not we should change our price in terms of the details of

7   our contract.

8        Certainly, with respect to the issues of community

9   support which is a requirement, we were relying on Mr. Brown

10  to get those letters and he failed to do so.

11       THE COURT:  Okay.

12       MR. SULLIVAN:  Judge, respectfully, there's not even

13  a pass-the-red-face-test argument that the fraud had any kind

14  of detrimental reliance.  They made their bid.  Within very

15  short order, they knew that CFS was bidding alongside of them

16  and they could do whatever they wanted to do with regard to

17  price or not with regard to price.

18       THE COURT:  Okay.  You know, I am doubtful as to

19  whether or not this is going to be something I will be able to

20  decide on a motion for summary judgment.

21       Part of the reason why I like to have a pre-motion

22  conference is so that we can narrow the scope of any motion

23  for summary judgment and in this case, what I have before me

24  are parties -- I don't know, we have 15 counts here.  It seems

25  to me at least a series of issues of fact that are in dispute,

1    but I have the proposed motions that would go to every client.

2         So, part of this exercise for me was to highlight

3    for you all at least how it is that I am approaching this and

4    that before the parties make their submissions, and now maybe

5    we will never get to that point, that you all are mindful of

6    what the purpose is of a motion for summary judgment, what the

7    limited role is that I have at this point, so that we are

8    effectively using the Court's time.

9         There have been a lot of opportunities for the

10   parties to kind of just try allegations.  I have read it.  I

11   have read the motion to dismiss.  I have read the motion for

12   judgment on the pleadings before Judge Ross.  So, I am

13   familiar with the parties' positions.  If you all have

14   arguments that you all want to make on a motion for summary

15   judgment just so that you can have an opportunity to kind of

16   preview your arguments for me, it is probably not a good use

17   of any of our time.

18        This has been helpful to me though but, you know, I

19   would say that you exercised some restraint in the preparation

20   of your papers and I don't believe that the letters that are

21   before me suggest that you had intended to kind of do so.  I

22   am not precluding you.  I would never say I am precluding you

23   from moving on any basis, but I would like for us to just move

24   smartly to the resolution of the issues that we can because I

25   certainly would like to get rid of claims that do not need to

39

1   go to a jury, where I can decide them as a matter of law and I

2   believe that some of them exist here.  I certainly do.

3          I think that there are probably going to be some

4   claims here that the facts will allow me to decide as a matter

5   of law, but many of them, I don't think that is the case.

6          Is there anything that the parties wanted to raise

7   with the Court before we conclude?

8          MR. ANDRES:  No.  Thank you, Your Honor.

9          MR. SULLIVAN:  No, Your Honor.

10         MR. ANDRES:  Thank you, Judge.  That was very

11  helpful.

12         THE COURT:  Thank you.  I appreciate your time.

13         (Matter concluded.)

14

15

16

17                      *      *      *      *      *

18

19

20  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

21

22      /s/ Charleane M. Heading              March 29, 2016

23  _____     _____
        CHARLEANE M. HEADING                     DATE

24

25

CMH      OCR      RMR      CRR      FCRR